[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 229.]

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, CENTRAL STATE UNIVERSITY CHAPTER, APPELLEE AND CROSS-APPELLANT, *v.* CENTRAL STATE UNIVERSITY, APPELLANT AND CROSS-APPELLEE.

[Cite as *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 1998-Ohio-282.]

*Education—State universities—Faculty workload policies—R.C. 3345.45 violates the Equal Protection Clauses of the Ohio and United States Constitutions.*

R.C. 3345.45 violates the Equal Protection Clauses of the Ohio and United States Constitutions since the classification contained therein bears no rational relationship to a legitimate governmental interest.

(No. 97-568—Submitted March 4, 1998—Decided September 30, 1998.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Greene County, No. 96-CA-21.

———————————

{¶ 1} Plaintiff-appellee and cross-appellant, American Association of University Professors, Central State University Chapter ("AAUP"), is the certified collective bargaining agent for full-time faculty members at defendant-appellant and cross-appellee, Central State University ("CSU"). AAUP and CSU have engaged in collective bargaining since 1985. Their most recent agreement was effective September 1, 1991 through August 31, 1994. Article 19 of that agreement governed faculty workload and provided, among other things, that the "[n]ormal full-time workload will be twelve (12) contact hours per quarter," and that "[i]f a Bargaining Unit member teaches more than twelve (12) contact hours  * * *, then the additional hours will be considered as an overload" entitling the member, at his or her option, to either "overload compensation" or "the equivalent in release time in a subsequent quarter." It also provided that "[b]argaining unit members will

have at least eight (8) posted office hours per week and will be available for additional hours by appointment."

**{¶ 2}** At the time the parties entered into this agreement, the provisions governing faculty workload were appropriate subjects for collective bargaining under R.C. 4117.08(A), and binding on the parties under R.C. 4117.10(A). However, while the agreement was in effect, the General Assembly enacted R.C. 3345.45 as part of Am.Sub.H.B. No. 152, 145 Ohio Laws, Part II, 3767. R.C. 3345.45, effective July 1, 1993, provides as follows:

"On or before January 1, 1994, the Ohio board of regents jointly with all state universities, as defined in section 3345.011 of the Revised Code, shall develop standards for instructional workloads for full-time and part-time faculty in keeping with the universities' missions and with special emphasis on the undergraduate learning experience. The standards shall contain clear guidelines for institutions to determine a range of acceptable undergraduate teaching by faculty.

"On or before June 30, 1994, the board of trustees of each state university shall take formal action to adopt a faculty workload policy consistent with the standards developed under this section. *Notwithstanding section 4117.08 of the Revised Code, the policies adopted under this section are not appropriate subjects for collective bargaining. Notwithstanding division (A) of section 4117.10 of the Revised Code, any policy adopted under this section by a board of trustees prevails over any conflicting provisions of any collective bargaining agreement between an employees organization and that board of trustees.*" (Emphasis added.)

**{¶ 3}** Also enacted as part of Am.Sub.H.B. No. 152, Section 84.14, uncodified, provides:

"Pursuant to section 3345.45 of the Revised Code, the Ohio Board of Regents shall work with state universities to ensure that no later than fall term 1994 a minimum ten per cent increase in statewide undergraduate teaching activity be achieved to restore the reductions experienced over the past decade.

2

*Notwithstanding section 3345.45 of the Revised Code, any collective bargaining agreement in effect on the effective date of this act shall continue in effect until its expiration date*." (Emphasis added.) 145 Ohio Laws, Part III, 4539.

{¶ 4} On April 15, 1994, AAUP and CSU began negotiations for a successor agreement. On June 16, 1994, CSU unilaterally adopted a new workload policy pursuant to R.C. 3345.45, which it later amended in November 1994. That policy, as amended, provides:

"The normal full-time teaching load will be a range of 36 to 40 contact hours per academic year. The normal teaching load in any quarter will not exceed 15 contact hours. Faculty members shall have at least ten office hours distributed over the five day work week."

{¶ 5} On July 28, 1994, CSU notified AAUP that it would not bargain over the issue of faculty workload, "as faculty workload is no longer subject to the collective bargaining process as a result of House Bill 152." However, the parties entered into an agreement on December 14, 1994, as follows:

"In the event that a court of competent jurisdiction rules that O.R.C. 3345.45 is unconstitutional, or otherwise finds that the University and AAUP must or can bargain concerning faculty workload, the provisions of this article [Article 19] shall be reopened, and the University and AAUP shall commence negotiations concerning faculty workload."

{¶ 6} Meanwhile, the parties continued to operate under the terms and conditions of the 1991-1994 agreement while bargaining on issues other than workload.

{¶ 7} On May 17, 1995, AAUP filed a complaint for declaratory judgment and injunctive relief, and a motion for a preliminary injunction pursuant to Civ.R. 65(B), alleging that R.C. 3345.45 violates the Equal Protection Clauses of the Ohio and United States Constitutions, and Section 1, Article I of the Ohio Constitution. The trial court ordered trial on the merits of the action to be advanced and

consolidated with the hearing on the application for preliminary injunction, in accordance with Civ.R. 65(B)(2).

{¶ 8} Following an evidentiary hearing, the trial court denied AAUP's requests for declaratory judgment and injunctive relief, and held R.C. 3345.45 to be constitutional in its entirety. In so doing, the court found:

"The legislature had a legitimate governmental purpose in the enactment of Ohio Revised Code Section 3345.45. The legitimate governmental purpose is to recapture the ten (10%) percent decline in teaching that had occurred in undergraduate teaching in State four (4) year universities, thereby enhancing the quality of undergraduate education at four (4) year State institutions. Another legitimate governmental purpose is to reallocate faculty attention to teaching and away from research. The legislative purpose also was to ensure that all State four (4) year universities uniformly implement workload policy consistent with the universities' mission.

"The collective bargaining language contained in Ohio Revised Code Section 3345.45 represents a legitimate governmental purpose as it enables the legislature to ensure that the ten (10%) percent decline will be recaptured uniformly by departments with the state universities consistent with each university's individual mission.

"Ohio Revised Code Section 3345.45 bears a rational relationship to the legitimate government purpose. Ohio Revised Code 3345.45 requires the State universities to implement workload policies designed to recapture the ten (10%) percent decline in instructional teaching. The collective bargaining provision contained in Ohio Revised Code Section 3345.45 ensures that each University will implement the workload policy consistent with the statute."

{¶ 9} The court of appeals reversed the decision of the trial court. In so doing, the appellate court found that the right to collectively bargain is a fundamental right, and that the trial court should have employed "intermediate

scrutiny," rather than the "rational relationship" test, in order to resolve the equal protection issue. However, the court of appeals did not determine whether R.C. 3345.45 runs afoul of equal protection, but instead remanded the cause to the trial court to determine whether the statute serves "important governmental objectives" and whether the classification contained therein is "substantially related to the achievement of those objectives."

{¶ 10} The cause is now before this court pursuant to the allowance of a discretionary appeal and cross-appeal.

_____

*Benesch, Friedlander, Coplan & Aronoff, L.L.P., Donald J. Mooney, Jr., James F. DeLeone* and *Mark D. Tucker*, for appellee and cross-appellant.

*Betty D. Montgomery,* Attorney General, *Lawrence J. Miltner* and *Jan A. Neiger*, Assistant Attorneys General, for appellant and cross-appellee.

*Snyder, Rakay & Spicer* and *Peter J. Rakay,* for *amicus curiae* Ohio Education Association.

*Betty D. Montgomery,* Attorney General, and *Lawrence J. Miltner*, Assistant Attorney General, for *amicus curiae* Ohio Board of Regents.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 11} The primary issue confronting the court today is whether R.C. 3345.45 violates the Equal Protection Clauses of the Ohio and United States Constitutions. CSU challenges the court of appeals' determination that collective bargaining is a fundamental right and its application of a heightened level of equal protection scrutiny. Although AAUP seeks to defend the reasoning of the court of appeals, its primary focus is on arguing that the rationales advanced in support of R.C. 3345.45 cannot withstand any level of equal protection scrutiny. For the following reasons, we hold that both appeals have merit.

**{¶ 12}** The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Section 2, Article I of the Ohio Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal protection and benefit * * *." These two provisions are functionally equivalent, and the standards for determining violations of equal protection are essentially the same under state and federal law. *State ex rel. Dayton Fraternal Order of Police Lodge No. 44 v. State Emp. Relations Bd.* (1986), 22 Ohio St.3d 1, 6, 22 OBR 1, 5, 488 N.E.2d 181, 185; *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 353, 639 N.E.2d 31, 33. Accordingly, we will consider the propriety of R.C. 3345.45 under both of these constitutional provisions as a single question.

**{¶ 13}** The standards for determining whether a law runs afoul of equal protection generally involve identifying the means and ends of the law at issue and examining the relationship between them. If the means employed by the law at issue create separate classes of persons who receive different treatment, the laws will be tested under the equal protection guarantee. Otherwise, if no distinctions are drawn and no classifications are created, there is no reason to subject the law to equal protection scrutiny. See *State ex rel. Doersam v. Indus. Comm.* (1989), 45 Ohio St.3d 115, 120, 543 N.E.2d 1169, 1174; *State v. Thompkins* (1996), 75 Ohio St.3d 558, 561, 664 N.E.2d 926, 929.

**{¶ 14}** There is no question that R.C. 3345.45 legislatively creates discrete classes of persons who receive differential treatment. The statute isolates university faculty members as the only public employees as defined in R.C. 4117.01(C) who are precluded from collectively bargaining over their workload.

**{¶ 15}** However, the mere fact that R.C. 3345.45 creates separate classes of persons does not render it suspect under the Equal Protection Clause. "The demand for 'equal protection' cannot be a demand that laws apply universally to all persons.

By the very nature of the work of the legislature, it must, if it is to act at all, impose special burdens upon or grant special benefits to special groups or classes of individuals." *Doersam, supra*, 45 Ohio St.3d at 119, 543 N.E.2d at 1173. Instead, the fact of classification serves only to subject the statute to equal protection scrutiny, that is, whether the classification created bears "a sufficient relationship to a required governmental purpose." *Id.*, 45 Ohio St.3d at 120, 543 N.E.2d at 1174.

{¶ 16} Generally, "[a] statutory classification which involves neither a suspect class nor a fundamental right does not violate the Equal Protection Clause of the Ohio Constitution if the classification is rationally related to a legitimate governmental interest." *Klepper v. Ohio Bd. of Regents* (1991), 59 Ohio St.3d 131, 133, 570 N.E.2d 1124, 1127. In other words, "[w]here neither a fundamental right nor a suspect class is involved, a legislative classification passes muster if the state can show a rational basis for the unequal treatment of different groups." *Fabrey, supra*, 70 Ohio St.3d at 353, 639 N.E.2d at 33.

{¶ 17} R.C. 3345.45 involves neither a suspect class nor a fundamental right. Although the court of appeals raised forceful arguments as to the value and importance of collective bargaining in Ohio, no authority of which we are aware has held the right of public employees to collectively bargain over their workload to be a fundamental right for equal protection purposes.

{¶ 18} In an effort to defend the court of appeals' analysis, AAUP claims that this court applied a heightened level of scrutiny to a statute denying certain Dayton municipal employees the collective bargaining rights enjoyed by other similarly situated municipal employees in *State ex rel. Dayton Fraternal Order of Police Lodge No. 44, supra*. AAUP argues that by framing the issue to be whether the Dayton exclusion "bears a fair and substantial relation to the object of the Public Employees Collective Bargaining Act," we actually applied an intermediate level of scrutiny. 22 Ohio St.3d at 6, 22 OBR at 5, 488 N.E.2d at 186. However, our focus in that case was clearly on whether the created classification was "*rationally*

*related to a legitimate government interest.*" (Emphasis added.) *Id.*, 22 Ohio St.3d at 6, 22 OBR at 5, 488 N.E.2d at 185. At no point did we hold the right of collective bargaining to be a fundamental right or apply a heightened or intermediate level of equal protection scrutiny.

{¶ 19} The determinative issue in this case is, therefore, whether R.C. 3345.45 bears a rational relation to a legitimate governmental interest. In considering this issue, we are guided by the principles that all legislative enactments enjoy a strong presumption of constitutionality and that, under rational-basis scrutiny, a legislative distinction will be upheld if there exists any conceivable set of facts to justify it. See *Fabrey, supra*, 70 Ohio St.3d at 352-353, 639 N.E.2d at 33; *Denicola v. Providence Hosp.* (1979), 57 Ohio St.2d 115, 119, 11 O.O.3d 290, 293, 387 N.E.2d 231, 234.

{¶ 20} The goal of R.C. 3345.45, as set forth in Section 84.14 of Am.Sub.H.B. No. 152, is "to ensure that no later than fall term 1994, a minimum ten percent increase in statewide undergraduate teaching activity be achieved to restore the reductions experienced over the past decade." The record suggests, and the parties agree, that the object of this legislation is not to increase total faculty workload, but to effect a change in the ratio between faculty activities in order to correct the imbalance between research and teaching at four-year undergraduate state institutions created by a faculty reward system which prizes research over teaching. Intrinsically, this is a concern over the quality of undergraduate education and, therefore, is a legitimate governmental interest.

{¶ 21} The fact that the General Assembly chose to correct only the decline in teaching-related activity at this time, rather than attempt to address all at once the various factors that the record suggests have contributed to the instability of higher education in Ohio, does not diminish the legitimacy of its interest. "It is generally recognized that when a legislative body chooses to act to correct a given

evil it need not correct all the evil at once, but it may proceed step-by-step." *State v. Buckley* (1968), 16 Ohio St.2d 128, 134, 45 O.O.2d 469, 473, 243 N.E.2d 66, 71.

{¶ 22} However, the existence of a legitimate governmental interest will not enable the legislative classification to pass constitutional muster if the party attacking the legislation can show that there is no rational basis for the differential treatment. Many of the arguments advanced by CSU and its supporting *amicus curiae*, Ohio Board of Regents, seek to establish a general relationship between faculty workload and quality of education, or to justify treating differently the faculty at two- and four-year institutions. Such arguments, however, miss the mark, as they fail to address the essential question of whether there exists a rational basis for placing faculty members in a class by themselves *as the only public employees as defined in R.C. 4117.01(C) denied the right to collectively bargain over their workload*.

{¶ 23} On this precise issue, CSU and the Ohio Board of Regents argue that in order to recoup the ten-percent decline in teaching, it is necessary to achieve uniformity, consistency, and equity in terms of faculty workload by university mission, and that collective bargaining produces considerable variation in faculty workload across the universities in departments having the same academic mission. In support of its position, CSU submitted as evidence to the trial court the following reports published prior and subsequent to the enactment of R.C. 3345.45: Report, Legislative Office of Education Oversight, The Faculty Reward System in Public Universities (July 1993); Report of the Managing for the Future Task Force, Challenges & Opportunities for Higher Education in Ohio (July 1992); Report of the Regents' Advisory Committee on Faculty Workload Standards & Guidelines (Feb. 18, 1994); Report of the Regents' Advisory Committee on Faculty Workload, The Evaluation & Reward of Teaching (June 1994); A Report of the Ohio Board of Regents, Securing the Future of Higher Education in Ohio (Dec. 1992); and the

Basic Data Series, a biennial publication of tables reflecting statistical data collected from Ohio colleges and universities.

{¶ 24} We have reviewed each of these reports, and all other evidence contained in the record, and can conclude with confidence that there is not a shred of evidence in the entire record which links collective bargaining with the decline in teaching over the last decade, or in any way purports to establish that collective bargaining contributed in the slightest to the lost faculty time devoted to undergraduate teaching. Indeed, these reports appear to indicate that factors other than collective bargaining are responsible for the decline in teaching activity.

{¶ 25} The Legislative Office of Education Oversight Report, *supra*, at 12, explains as follows:

"FACTORS CONTRIBUTING TO IMBALANCE

"The imbalance of research over teaching and service in the faculty reward system is due to a combination of three factors, and their effects on one another. These factors are embedded in the process of granting promotions and tenure to faculty at four-year institutions throughout the country. They include:

"1. A national competition among universities for prestige, funds, faculty, and students;

"2. The perceived difficulty of assessing faculty work other than research; and

"3. The nationwide culture of universities."

{¶ 26} The Report of the Managing for the Future Task Force explains:

"In Ohio, over the past ten years faculty time devoted to teaching and student advising has decreased somewhat, while time devoted to research has increased * * *. Faculty course sections assigned each term have not changed in the aggregate, but the average 'student credit hours taught' (credit hour value of the course times the number of students enrolled in the course) has decreased by 10% * * *. This would indicate either that faculty are teaching courses with fewer

students than in the past and/or they are spending their time on the research and service contributions that make up the balance of their work assignment." *Id.* at 40.

**{¶ 27}** The Report goes on to list a number of priorities and to make recommendations under each priority. "Priority 3" is entitled "Increase Productivity and Reduce Costs." *Id.* at 54. Under this priority, the Task Force seeks in part to "[e]nsure that faculty time is allocated in the most productive manner, consistent with institutional and departmental missions," and to accomplish this by having the Ohio Board of Regents require each public college and university to "[d]evelop an institutional faculty performance workload policy," and "[d]evelop and implement a faculty performance evaluation and appropriate reward system consistent with institutional mission, goals and objectives." *Id.* at 55.

**{¶ 28}** Although these concerns are strikingly similar to the arguments made by CSU and the Ohio Board of Regents, the Report itself does not support the elimination of collective bargaining rights in order to achieve consistency and uniformity. To the contrary, the Task Force specifically recommended under this priority an assurance that "[t]he rights of employees to bargain collectively are protected." *Id.* at 56.

**{¶ 29}** The 1990 Basic Data Series indicates that teaching workload, at least in terms of average "credit hours assigned" and average "weekly contact hours" is generally higher at state universities where collective bargaining has occurred than at other universities. Indeed, the Legislative Office of Education Oversight Report, *supra*, at 10, indicates that "71 percent of faculty report their interests lean toward or lay primarily in teaching," that "78 percent of these professors [regarding research as essential for tenure] would prefer teaching to be essential for tenure," and that "44 percent of faculty at public institutions felt that demands for research interfered with teaching."

**{¶ 30}** In addition, Dr. Howard L. Gauthier, Executive Associate to the Chancellor for Planning of the Ohio Board of Regents and author of the Regents' Report, testified as follows:

"Q. * * * I have gone through your report and response to that report, * * * and I couldn't find any recommendation in there on behalf of the Board of Regents that faculty not be allowed to bargain about their workload?

"A. That's correct.

"Q. And in fact I found absolutely no reports anywhere in the exhibits that have been offered by the State that suggest before July 1, 1993, that faculty not be allowed to bargain about their workload. Are you aware of any reports to that affect [*sic*]?

"A. I'm not.

" * * *

"Q. And I take it that you have done no other study either before or after the enactment of Section 3345.45 that suggested that somehow or another collective bargaining caused a reduction in any workload by faculty?

"A. That's correct."

**{¶ 31}** In light of the foregoing, we cannot find any rational basis for singling out university faculty members as the only public employees as defined in R.C. 4117.01(C) precluded from bargaining over their workload. Accordingly, we hold that R.C. 3345.45 violates the Equal Protection Clauses of the Ohio and United States Constitutions, since the classification contained therein bears no rational relationship to a legitimate governmental interest. We find further that, in light of this holding, it is unnecessary to address AAUP's remaining arguments.

**{¶ 32}** In light of all the foregoing, we conclude that AAUP is entitled to the declaratory judgment and injunctive relief that it has requested.

*Judgment accordingly.*

F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in the syllabus and judgment.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**COOK, J., dissenting.**

{¶ 33} Because I believe that a rational basis underlies R.C. 3345.45, I respectfully dissent.

{¶ 34} I agree with the majority that collective bargaining does not rise to the level of a fundamental right and, therefore, the proper inquiry in this case is whether R.C. 3345.45 bears a rational relation to a legitimate government interest. I depart, however, from the majority's ultimate conclusion that R.C. 3345.45 fails rational-basis scrutiny.

{¶ 35} R.C. 3345.45 represents a legislative response to a decade-long trend of declining teaching activity at four-year undergraduate state institutions in favor of research. Am.Sub.H.B. No. 152, Section 84.14, uncodified, 145 Ohio Laws, Part III, 4539. As noted by the majority, "The record suggests, and the parties agree, that the object of this legislation is not to increase total faculty workload, but to effect a change in the ratio between faculty activities in order to correct the imbalance between research and teaching at four-year undergraduate state institutions created by a faculty reward system which prizes research over teaching."

{¶ 36} The majority recognizes that R.C. 3345.45 is aimed at a legitimate government interest—the quality of undergraduate education. Nevertheless, it concludes that the statute violates the Equal Protection Clauses of our state and federal Constitutions because its means do not legitimately relate to its desired end. The majority supports its position by stating that "there is not a shred of evidence in the entire record which links collective bargaining with the decline in teaching over the last decade, or in any way purports to establish that collective bargaining contributed in the slightest to the lost faculty time devoted to undergraduate

teaching."  As I explain later in this dissent, however, that collective bargaining has not *caused* the decline in teaching proves nothing in assessing whether the faculty workload standards imposed pursuant to R.C. 3345.45 legitimately relate to that statute's purpose of restoring losses in undergraduate teaching activity.

{¶ 37} Initially, it is important to recognize the strong presumption of validity in favor of legislative classifications that do not involve fundamental rights or suspect classifications.  See*, e.g.,  Fed. Communications Comm. v. Beach Communications, Inc.* (1993), 508 U.S. 307, 314-315, 113 S.Ct. 2096, 2101-2102, 124 L.Ed.2d 211, 222;  *Kadrmas v. Dickinson Pub. Schools* (1988), 487 U.S. 450, 462, 108 S.Ct. 2481, 2489, 101 L.Ed.2d 399, 412.  Rational-basis scrutiny is intended to be a paradigm of judicial restraint, and where there are plausible reasons for the General Assembly's action, a court's inquiry must end. *Beach Communications*, 508 U.S. at 313-314, 113 S.Ct. at 2101, 124 L.Ed.2d at 221.   " 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' "  *Id.*, quoting  *Vance v. Bradley* (1979), 440 U.S. 93, 97, 99 S.Ct. 939, 942-943, 59 L.Ed.2d 171, 176.

{¶ 38} Accordingly,  to  enact  legislation  that  can  withstand  an  equal protection challenge proceeding under rational-basis scrutiny, a legislature "need not 'actually articulate at any time the purpose or rationale supporting its classification.' *Nordlinger* [*v. Hahn* (1992)]*, supra*, [505 U.S. 1] at 15 [112 S.Ct. 2326, 2334, 120 L.Ed.2d 1, 16].  See also*, e.g., United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 [101 S.Ct. 453, 461, 66 L.Ed.2d 368, 378] (1980)*; Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528 [79 S.Ct. 437, 441, 3 L.Ed.2d 480, 486] (1959).  Instead, a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' *Beach Communications, supra*, [508

U.S.] at 313 [113 S.Ct. at 2101, 124 L.Ed.2d at 221]. See also, *e.g., Nordlinger, supra,* [505 U.S.] at 11 [112 S.Ct. at 2334, 120 L.Ed.2d at 13]; *Sullivan v. Stroop*, 496 U.S. 478, 485 [110 S.Ct. 2499, 2504, 110 L.Ed.2d 438, 446] (1990); *Fritz, supra*, [449 U.S.] at 174-179 [101 S.Ct. at 459-461, 66 L.Ed.2d at 375-379]; *Vance v. Bradley*, 440 U.S. 93, 111 [99 S.Ct. 939, 949, 59 L.Ed.2d 171, 184] (1979); *Dandridge v. Williams* [1970]*, supra*, [397 U.S. 471] at 484-485 [90 S.Ct. 1153, 1161-1162, 25 L.Ed.2d 491, 501].

{¶ 39} "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' *Beach Communications, supra*, [508 U.S.] at 315 [113 S.Ct. at 2096, 124 L.Ed.2d at 222]. See also, *e.g., Vance v. Bradley, supra*, [440 U.S.] at 111 [99 S.Ct. at 949, 59 L.Ed.2d at 184]; *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812 [96 S.Ct. 2488, 2499, 49 L.Ed.2d 220, 232-233] (1976); *Brotherhood of Locomotive Firemen and Enginemen v. Chicago, R.I. & P.R. Co.*, 393 U.S. 129, 139 [89 S.Ct. 323, 328, 21 L.Ed.2d 289, 297] (1968). A statute is presumed constitutional, see *supra*, at 319 [113 S.Ct. at 2642, 125 L.Ed.2d at 270], and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 [93 S.Ct. 1001, 1006, 35 L.Ed.2d 351, 358] (1973) (internal quotation marks omitted), whether or not the basis has a foundation in the record." *Heller v. Doe* (1993), 509 U.S. 312, 320-321, 113 S.Ct. 2637, 2642-2643, 125 L.Ed.2d 257, 270-271.

{¶ 40} Based on this standard, the majority does not demonstrate that R.C. 3345.45 is unconstitutional when it says that there is no evidence in the record linking collective bargaining to the decline in teaching, or cites statistical evidence tending to show that university faculty members are more interested in teaching than research and would prefer teaching to be the essential criterion for tenure.

Under rational-basis scrutiny, "the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, *see United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 174, 179 [101 S.Ct. 453, 459, 461, 66 L.Ed.2d 368, 376, 378] (1980), the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, *see Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 464 [101 S.Ct. 715, 724, 66 L.Ed.2d 659, 669] (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne v. Cleburne Living Center, Inc*. [1985], 473 U.S. [432], 446 [105 S.Ct. 3249, 3257, 87 L.Ed.2d 313, 324]." *Nordlinger v. Hahn* (1992), 505 U.S. 1, 11, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1, 13. Because R.C. 3345.45 concerns a legitimate government interest, the only remaining question is whether the General Assembly rationally could have believed that imposing uniform workload standards would promote its objective. See *W. & S. Life Ins. Co. v. State Bd. of Equalization of California* (1981), 451 U.S. 648, 671, 101 S.Ct. 2070, 2084-2085, 68 L.Ed.2d 514, 533.

{¶ 41} The evidence before the trial court tended to demonstrate that while the current imbalance between teaching and research is due to factors unrelated to collective bargaining, it is unlikely that the collective bargaining process will bring research and teaching into balance in the absence of legislative intervention. Research provides the primary basis for competition among universities for prestige, funds, faculty, and students. This emphasis on research, in turn, leads teachers to focus their efforts disproportionately on research in hopes of increasing their value to their respective universities and marketability to more prestigious institutions. Accordingly, neither the universities nor the faculty members would seem to have much incentive to bargain for an increase in the ratio of teaching to research.

**{¶ 42}** R.C. 3345.45 requires a joint effort between the board of regents and state universities to "develop standards for instructional workloads," setting a "range of acceptable undergraduate teaching by faculty." It also removes that subject from collective bargaining in order to ensure that the workload standards are implemented consistently.

**{¶ 43}** The majority's concern that collective bargaining did not cause the decline in teaching activity that R.C. 3345.45 seeks to rectify is inconsequential to our rational-basis review. It matters not that the General Assembly fashioned R.C. 3345.45 to treat an undesirable symptom rather than to eliminate its cause. " 'The legislature may select one phase of one field and apply a remedy there, neglecting the others.' " *Beach Communications*, 508 U.S. at 316, 113 S.Ct. at 2102, 124 L.Ed.2d at 223, quoting *Williamson v. Lee Optical of Oklahoma, Inc.* (1955), 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573. Instead, once we have determined that the General Assembly acted with a legitimate government interest in mind, rational-basis scrutiny requires that we look only to the legislative action taken and determine whether it is arbitrary or irrational.

**{¶ 44}** "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it ' "is not made with mathematical nicety or because in practice it results in some inequality." ' *Dandridge v. Williams, supra*, [397 U.S.] at 485 [90 S.Ct. at 1161, 25 L.Ed.2d at 501-502], quoting *Lindsley v. Natural Carbonic Gas Co*., 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369, 377] (1911). 'The problems of government are practical ones and may justify, if they do not require, rough accommodations — illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69-70 [33 S.Ct. 441, 443, 57 L.Ed. 730, 734] (1913). See also, e.g*., Burlington Northern R. Co. v. Ford*, 504 U.S. 648, 651 [112 S.Ct. 2184, 2187, 119 L.Ed.2d 432, 438] (1992); *Vance v. Bradley, supra*, [440 U.S.] at 108 [99 S.Ct. at 948, 59 L.Ed.2d at

183] and n. 26; *New Orleans v. Dukes, supra*, [427 U.S.] at 303 [96 S.Ct. at 2516, 49 L.Ed.2d at 517]*; Schweiker v. Wilson*, 450 U.S. 221, 234 [101 S.Ct. 1074, 1082, 67 L.Ed.2d 186, 198] (1981)." *Heller*, 509 U.S. at 321, 113 S.Ct. at 2642-2643, 125 L.Ed.2d at 271.

{¶ 45} The General Assembly's choice to "single out" university faculty as the only class of public employees as defined in R.C. 4117.01(C) who are precluded from collectively bargaining over their workload is not arbitrary. R.C. 3345.45's goal of recovering recent decreases in teaching activity at state universities exclusively relates to the workload of university faculty members, providing a reasonable basis for the classification. Further, imposing uniform workload standards upon university faculty at state four-year institutions is not an irrational means of effecting an increase in teaching activity. In fact, it was probably the most direct means of accomplishing that objective available to the General Assembly.

{¶ 46} Based on all of the foregoing, I believe that R.C. 3345.45 is rationally related to a legitimate government interest and must be upheld against today's equal protection challenge. Accordingly, I would reverse the decision of the court of appeals.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

————————————