CENTRAL STATE UNIVERSITY *v.* AMERICAN ASSO-
CIATION OF UNIVERSITY PROFESSORS, CENTRAL
STATE UNIVERSITY CHAPTER

No. 98–1071.  Decided March 22, 1999

PER CURIAM.

Petitioner Central State University challenges a ruling of the Ohio Supreme Court striking down on equal protection grounds a state law requiring public universities to develop standards for professors' instructional workloads and exempting those standards from collective bargaining. We grant the petition and reverse the judgment of the Ohio Supreme Court.

In an effort to address the decline in the amount of time that public university professors devoted to teaching as opposed to researching, the State of Ohio enacted Ohio Rev. Code Ann. § 3345.45 (1997). This provision provides in relevant part:

> "On or before January 1, 1994, the Ohio board of regents jointly with all state universities . . . shall develop standards for instructional workloads for full-time and part-time faculty in keeping with the universities' missions and with special emphasis on the undergraduate learning experience. . . .
>
> "On or before June 30, 1994, the board of trustees of each state university shall take formal action to adopt a faculty workload policy consistent with the standards developed under this section. Notwithstanding [other provisions making faculty workload at public universities a proper subject for collective bargaining], the policies adopted under this section are not appropriate subjects for collective bargaining. Notwithstanding [these collective-bargaining provisions], any policy adopted under this section by a board of trustees prevails over any conflicting provisions of any collective bargaining agreement between an employees organization and that board of trustees."*

---

*As part of the same bill codified at § 3345, the Ohio General Assembly also enacted uncodified legislation providing that the Board of Regents

In 1994, petitioner Central State University adopted a workload policy pursuant to § 3345.45 and notified respondent, the certified collective-bargaining agent for Central State's professors, that it would not bargain over the issue of faculty workload. Respondent subsequently filed a complaint in Ohio state court for declaratory and injunctive relief, alleging that § 3345.45 created a class of public employees not entitled to bargain regarding their workload and that this classification violated the Equal Protection Clauses of the Ohio and United States Constitutions.

By a divided vote, the Ohio Supreme Court agreed with respondent that § 3345.45 deprived public university professors the equal protection of the laws. See 83 Ohio St. 3d 229, 699 N. E. 2d 463 (1998). The court acknowledged that Ohio's purpose in enacting the statute was legitimate and that all legislative enactments enjoy a strong presumption of constitutionality. *Id.*, at 234–235, 699 N. E. 2d, at 468–469. Nonetheless, the court held that § 3345's collective-bargaining exemption bore no rational relationship to the State's interest in correcting the imbalance between research and teaching at its public universities. See *id.*, at 236–239, 699 N. E. 2d, at 469–470. The State had argued that achieving uniformity, consistency, and equity in faculty workload was necessary to recapture the decline in teaching, and that collective bargaining produced variation in workloads across universities in departments having the same academic mission. *Id.*, at 236, 699 N. E. 2d, at 469. Reviewing evidence that the State had submitted in support of this

shall work with state universities "to ensure that no later than [the] fall term 1994, a minimum ten percent increase in statewide undergraduate teaching activity be achieved to restore the reductions experienced over the past decade. Notwithstanding section 3345.45 of the Revised Code, any collective bargaining agreement in effect on the effective date of this act shall continue in effect until its expiration date." Amended Substitute House Bill No. 152, § 84.14, 145 Ohio Laws 4539 (effective July 1, 1993).

contention, the Ohio Supreme Court held that "there is not a shred of evidence in the entire record which links collective bargaining with the decline in teaching over the last decade, or in any way purports to establish that collective bargaining contributed in the slightest to the lost faculty time devoted to undergraduate teaching." *Ibid.* Based on this determination, the court concluded that the State had failed to show "any rational basis for singling out university faculty members as the only public employees . . . precluded from bargaining over their workload." *Id.*, at 237, 699 N. E. 2d, at 470.

The dissenting justices pointed out that the majority's methodology and conclusion conflicted with this Court's standards for rational-basis review of equal protection challenges. See *id.*, at 238–241, 699 N. E. 2d, at 471–472. In their view, "that collective bargaining has not *caused* the decline in teaching proves nothing in assessing whether the faculty workload standards imposed pursuant to R. C. 3345.45 legitimately relate to that statute's purpose of restoring losses in undergraduate teaching activity." *Id.*, at 238, 699 N. E. 2d, at 471 (emphasis in original). The majority's review of the State's evidence was therefore "inconsequential" to the only question in the case: whether the challenged legislative action was arbitrary or irrational. See *id.*, at 239–242, 699 N. E. 2d, at 472–473. Answering this question, the dissent concluded that imposing uniform workload standards via the exemption "is not an irrational means of effecting an increasing in teaching activity. In fact, it was probably the most direct means of accomplishing that objective available to the General Assembly." *Id.*, at 241, 699 N. E. 2d, at 473.

We agree that the Ohio Supreme Court's holding cannot be reconciled with the requirements of the Equal Protection Clause. We have repeatedly held that "a classification neither involving fundamental rights nor proceeding along sus-

pect lines ... cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose." *Heller* v. *Doe*, 509 U. S. 312, 319–321 (1993) (citations omitted); *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313–314 (1993); *Nordlinger* v. *Hahn*, 505 U. S. 1, 11 (1992). The legislative classification created by § 3345.45 passes this test. One of the statute's objectives was to increase the time spent by faculty in the classroom; the imposition of a faculty workload policy not subject to collective bargaining was an entirely rational step to accomplish this objective. The legislature could quite reasonably have concluded that the policy animating the law would have been undercut and likely varied if it were subject to collective bargaining. The State, in effect, decided that the attainment of this goal was more important than the system of collective bargaining that had previously included university professors. See *Vance* v. *Bradley*, 440 U. S. 93 (1979) (upholding a similar enactment of Congress providing that federal employees covered by the Foreign Service retirement system, but not those covered by the Civil Service retirement system, would be required to retire at age 60).

The fact that the record before the Ohio courts did not show that collective bargaining in the past had lead to the decline in classroom time for faculty does not detract from the rationality of the legislative decision. See *Heller, supra*, at 320 ("A State ... has no obligation to produce evidence to sustain the rationality of a statutory classification"). The legislature wanted a uniform workload policy to be in place by a certain date. It could properly conclude that collective bargaining about that policy in the future would interfere with the attainment of this end. Under our precedent, this is sufficient to sustain the exclusion of university professors from the otherwise general collective-bargaining scheme for public employees.

The petition for a writ of certiorari is granted, the judgment of the Supreme Court of Ohio is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring.

I join the *per curiam* opinion recognizing, as the Court did in *Nordlinger* v. *Hahn*, 505 U. S. 1 (1992), that for the mine run of economic regulations that do not trigger heightened scrutiny, it is appropriate to inquire whether the lawmaker's classification

> "rationally furthers a legitimate state interest. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 174, 179 (1980), the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 464 (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. [432, 446 (1985)]." *Id.,* at 11.

I also recognize that a summary disposition is not a fit occasion for elaborate discussion of our rational-basis standards of review. See *Hohn* v. *United States,* 524 U. S. 236, 251 (1998) (opinions rendered without full briefing or argument have muted precedential value). JUSTICE STEVENS emphasizes that this case is of dominant importance to the state universities in Ohio, see *post,* at 131 (dissenting opinion); in that light, the Ohio Supreme Court is of course at liberty to resolve the matter under the Ohio Constitution.

Justice Stevens, dissenting.

While surveying the flood of law reviews that crosses my desk, I have sometimes wondered whether law professors have any time to spend teaching their students about the law. Apparently, a majority of the legislators in Ohio had a similar reaction to the work product of faculty members in Ohio's several state universities. By enacting Ohio Rev. Code Ann. § 3345.45 (1997), the legislators decided to do something about what they perceived to be a problem that neither the State Board of Regents nor the trustees of those universities could solve for themselves. Section 3345.45 directs that board and those trustees to develop standards and policies for instructional workloads for university faculty members. It provides that faculty members of public universities, unlike any other group of public employees, may not engage in collective bargaining about their workload.

How the intellectually gifted citizens of Ohio who have selected teaching as their profession shall allocate their professional endeavors between research and teaching is a matter of great importance to themselves, to their students, and to the consumers of their scholarly writing. Who shall decide how the balance between research and teaching shall be struck presents a similarly important question.

Prior to § 3345.45, the faculty members' freedom to make such decisions was constrained only by the teaching or research assignments imposed by their superiors in the educational establishment. By its enactment of § 3345.45, the Ohio General Assembly has asserted an interest in playing a role in making these decisions. As a result of the filing of this lawsuit, first the Ohio courts and now this Court have also participated in this decisional process.

Buried beneath the legal arguments advanced in this case lies a debate over academic freedom. In my judgment the relevant sources of constraint on that freedom are (1) the self-discipline of the teacher, (2) her faculty or department supervisors, (3) the trustees of the university where she

teaches, (4) the State Board of Regents, (5) the state legislature, (6) state judges, and, finally, (7) the judges sitting on this Court. I omit any reference to the collective-bargaining representatives of the teachers because, as everyone agrees, there is no evidence that collective bargaining has had any effect on the increased emphasis on research over teaching that gave rise to the enactment of § 3345.45.[1]

I have neither the mandate nor the inclination to assess whether the decision of the Ohio General Assembly to enact § 3345.45 was wise or unwise. I am equally convinced that this Court should not review the role played by the Ohio judiciary in deciding how to resolve this dispute. The case is important to the state universities in Ohio, but it has little, if any, national significance. Seven of the eleven Ohio judges who reviewed the case concluded that the Ohio statute violated the Ohio Constitution.[2] Indeed, the majority

---

[1] After reviewing studies prepared by the Legislative Office of Education Oversight, by a Special Task Force on Challenges & Opportunities for Higher Education in Ohio, by the Regents' Advisory Committee on Faculty Workload Standards & Guidelines, by the Regents' Advisory Committee on Faculty Workload, and by the Ohio Board of Regents, as well as statistical data collected from Ohio colleges and universities, the Ohio Supreme Court concluded:

"We have reviewed each of these reports [relied upon by Central State University], and all other evidence contained in the record, and can conclude with confidence that there is not a shred of evidence in the entire record which links collective bargaining with the decline in teaching over the last decade, or in any way purports to establish that collective bargaining contributed in the slightest to the lost faculty time devoted to undergraduate teaching. Indeed, these reports appear to indicate that factors other than collective bargaining are responsible for the decline in teaching activity." 83 Ohio St. 3d 229, 236, 699 N. E. 2d 463, 469 (1998).

[2] The seven judges include the four from the majority· opinion of the State Supreme Court and the three judges of the Court of Appeals who originally struck down § 3345.45.

The State Supreme Court held that the statute violated Article I, § 2, of the Ohio Constitution, which provides:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter,

opinion of the Ohio Supreme Court did not cite a single case decided by this Court.

If the State Supreme Court did misconstrue the Equal Protection Clause of the Federal Constitution, the impact of that arguable error is of consequence only in the State of Ohio, and will, in any event, turn out to be totally harmless if that court adheres to its previously announced interpretation of the State Constitution. I therefore believe that the Court should deny the petition for certiorari.

If the case does warrant this Court's review, it should not be decided summarily. It surely should not be disposed of simply by quoting descriptions of the rational-basis standard of review articulated in four nonunanimous opinions of this Court deciding wholly dissimilar issues. Cases applying the rational-basis test have described that standard in various ways. Compare, *e. g.*, the Court's opinions in *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920), and *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 446 (1985), with the majority opinion in *Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 174–177 (1980). Indeed, in the latter case there were three opinions, each of which formulated the rational-basis standard differently from the other two. *Ibid.* (majority opinion); *id.,* at 180–181 (STEVENS, J., concurring in judgment); *id.,* at 183–184 (Brennan, J., dissenting).[3]

_____

reform, or abolish the same, whenever they may deem it necessary; and no special privileges or immunities shall ever be granted, that 'may not be altered, revoked, or repealed by the General Assembly." The court found it unnecessary to consider respondent's additional arguments based, in part, on other provisions of the State Constitution. *Id.,* at 237, 699 N. E. 2d, at 470.

[3] In a footnote to the opinion in *Fritz* that cited a number of rational-basis cases, the Court made this observation:

"The most arrogant legal scholar would not claim that all of these cases applied a uniform or consistent test under equal protection principles. And realistically speaking, we can be no more certain that this opinion will remain undisturbed than were those who joined the opinion in *Lindsley* [v. *Natural Carbonic Gas Co.,* 220 U. S. 61 (1911)], *[F. S.] Royster Guano*

The Court's disposition of this case seems to assume that an incantation of the rational-basis test, together with speculation that collective bargaining might interfere with the adoption of uniform faculty workload policies, makes it unnecessary to consider any other facts or arguments that might inform an exercise of judgment about the underlying issue. While I am not prepared to express an opinion about the ultimate merits of the case, I can identify a serious flaw in the Court's mechanistic analysis. The Court assumes that the question improperly answered by the Ohio Supreme Court is whether collective bargaining may interfere with the attainment of a uniform workload policy.[4] But that is not the issue, because this case involves the Equal Protection Clause, and not the principles of substantive due process.

The question posed by this case is whether there is a rational basis for discriminating against faculty members by depriving them of bargaining assistance that is available to all other public employees in the State of Ohio.[5] Even the Court's speculation about the possible adverse consequences of collective bargaining about faculty workload does not explain why collective bargaining about the workloads of all other public employees might not give rise to the same adverse consequences arising from lack of statewide uniform-

---

*Co.* [v. *Virginia*, 253 U. S. 412 (1920)], or any of the other cases referred to in this opinion and in the dissenting opinion." 449 U. S., at 176–177, n. 10.

[4] In addition, the Court's opinion assumes that the ultimate objective of having teachers spend more time in classrooms requires that there be a single workload policy for each of the State's universities and for each of the subjects taught in those schools, whether Latin, medicine, or astrophysics. I am not at all sure that such an assumption is rational.

[5] Ohio Rev. Code Ann. § 4117.03(A)(4) (1998) provides: "Public employees have the right to: . . . Bargain collectively with their public employers to determine wages, hours, terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement, and enter into collective bargaining agreements. . . ."

ity.   Indeed, I would suppose that the interest in protecting the academic freedom of university faculty members might provide a rational basis for giving them *more* bargaining assistance than other public employees.   In any event, no one has explained why there is a rational basis for concluding that they should receive *less*.

I respectfully dissent.