**Edward DILORETO, Plaintiff–Appellant,**

v.

**DOWNEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION; Edward Sussman, individually and in his capacity as superintendent; Betty N. Ferraro, individually and in her official capacity as president; Margo Hoffer, individually and in her official capacity as a member, Downey Unified School District, Board of Education, Defendants–Appellees.**

No. 98–56762.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1999

Filed Nov. 8, 1999

Patrick J. Manshardt, Individual Rights Foundation, Los Angeles, California, for the plaintiff-appellant.

John W. Allen, Gibeaut, Mahan & Briscoe, Los Angeles, California, for the defendants-appellees.

Arthur D. Hodge, Gibeaut, Mahan & Briscoe, Los Angeles, California, for the defendants-appellees.

Thomas V. Christopher, Los Angeles, California, for amicus curiae The Anti–Defamation League.

David R. Huggins, Virginia Beach, Virginia, for amicus curiae The National Legal Foundation.

Kevin J. Hasson, Washington, DC, for amicus curiae The Becket Fund for REligious Liberty.

Before: KOZINSKI and THOMAS, Circuit Judges, and ILLSTON,* District Judge.

ILLSTON, District Judge:

Appellant Edward DiLoreto sued the superintendent of the Downey Unified School District and two members of the Board of Education (collectively "the District") based on the District's refusal to post an advertisement, paid for by Mr. DiLoreto, on Downey High School's baseball field fence. The advertisement contained the text of the Ten Commandments. Mr. DiLoreto contends that the District's refusal to post the advertisement violated his right to free speech under the First Amendment to the United States Constitution. The District raises the defense that posting the sign would have violated the Establishment Clause of the First Amendment and that it feared disruption and controversy that the sign might precipitate. The District Court granted summary judgment to the District, and this appeal followed.

We affirm because we conclude that the baseball field fence was a forum limited to certain subjects and not open for indiscriminate use by the general public. *See Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). We hold that the District could exclude subjects from the nonpublic forum that would be disruptive to the educational purpose of the school. We also hold that neither the District's refusal to post the sign nor the District's later decision to close the forum to all advertising constituted viewpoint discrimination.

**I.**

The parties do not dispute the material facts. In September of 1995, Downey High School's Baseball Booster Club ("Booster Club") raised funds by soliciting ads from local businesses. The ads were to be posted on the school's baseball field fence in exchange for a $400 donation. Mr. DiLoreto, Chief Executive Officer of Yale Engineering, purchased an ad and submitted a design containing a lengthy message and listing the Ten Commandments. Mr. DiLoreto subsequently revised his proposal to be less wordy. His final ad proposal read as follows:

For Peace in Our Day!
Pause & Meditate on These Principles to Live By!

1. I am the Lord your God you shall have no other gods besides me.
2. Take not the name of God in vain.
3. Keep holy the Sabbath Day.
4. Honor your father and your mother.
5. You shall not kill.
6. You shall not commit adultery.
7. You shall not steal.
8. You shall not bear false witness.
9. Do not covet your neighbor's wife.
10. Do not covet your neighbor's goods.

---

* The Honorable Susan Y. Illston, United States District Judge for the Northern District of California, sitting by designation.

To earn respect for ourselves & our community we must do noble acts for the love of God & concern for our country. Edward and Jill Di Loreto Family Trust

Mr. Layne, the principal of Downey High School, declined to post the sign, and defendant Edward Sussman, the district superintendent, ratified that decision. The Booster Club refunded Mr. DiLoreto's donation. The District declined to post the sign based on (1) concern about running afoul of the Establishment Clause; and (2) disruption, controversy and expensive litigation that might arise from community members seeking to remove the sign or from religious or political statements that others might wish to post.

Mr. DiLoreto subsequently sought a legal opinion from the Attorney General of the State of California regarding the legal ramifications of the District's decision not to post the sign. The Attorney General's Office issued an opinion on September 13, 1996, which concluded that refusing to post an otherwise appropriate business advertisement that clearly identified the advertising party and merely incorporated a religious message does not comport with the United States and California Constitutions. 79 Op. Cal. Atty. Gen. 196 (1996). On October 3, 1996, the District discontinued the program and removed approximately forty other signs that had been posted on the baseball field fence pursuant to paid advertising arrangements with the Booster Club.[1]

The undisputed evidence in the record reflects that the District excluded advertisements from the fundraising program that involved subject matters deemed sensitive and inappropriate in the public secondary school context. For example, the District did not permit advertisements for alcohol or taverns. The District also excluded an ad for Planned Parenthood. Nothing in the record indicates that anything other than commercial advertising was ever permitted on the Downey High School field fence.

On May 2, 1997, Mr. DiLoreto filed a complaint in Los Angeles County Superior Court alleging, *inter alia*, violation of his rights to free speech under the United States and California Constitutions. The District removed the action to the United States District Court for the Central District of California. The District Court remanded Mr. DiLoreto's claims under the California Constitution, and retained only Mr. DiLoreto's federal constitutional claims under 42 U.S.C. § 1983. In the state court action, the Los Angeles County Superior Court granted the District's motion for summary judgment. On August 19, 1999, during the pendency of this appeal, the California Court of Appeal affirmed, finding that posting the ad would have violated Article I, section 4 of the California Constitution,[2] and that refusing

---

1. Neither party extensively briefed the question of mootness, although the fact that the District effectively closed the forum by removing the signs raises this issue. A controversy is moot, and therefore nonjusticiable, when it is no longer "ongoing," or where the court is no longer capable of "affect[ing] the rights of litigants in the case before [it]." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)(quoting *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)). The Supreme Court has held, however, that "voluntary cessation of allegedly illegal conduct ... does not make the case moot." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In a similar situation involving closing a forum, the Seventh Circuit concluded that a live controversy remained. *Sefick v. Gardner,* 164 F.3d 370, 372 (7th Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 2393, 144 L.Ed.2d 794 (1999) ("[The] current no-display policy, adopted after the commencement of this suit, is not implemented by statute or regulation and could be changed again, so ... voluntary cessation of the challenged conduct does not eliminate the controversy."). Accordingly, we conclude a live controversy continues to exist, and address the parties' arguments on the merits.

2. Article I, section 4 of the California Constitution states:

> Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State.

to post the ad did not violate Mr. DiLoreto's free speech rights under Article I, section 2 of the California Constitution. *DiLoreto v. Board of Educ.*, 74 Cal. App.4th 267, 87 Cal.Rptr.2d 791 (1999).

▮ In the federal action, the District Court denied Mr. DiLoreto's motion for summary judgment, and granted the District's motion for summary judgment. The District Court concluded that posting Mr. DiLoreto's sign would have violated the Establishment Clause of the First Amendment to the United States Constitution. The District Court also concluded that refusing to post the sign did not violate Mr. DiLoreto's free speech rights because the baseball field was a nonpublic forum, and the District's decision not to post the sign was reasonable as well as viewpoint neutral. Mr. DiLoreto filed a timely notice of appeal.[3]

## II.

▮ We review *de novo* a district court's grant of summary judgment. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). We must determine, viewing the evidence in the light most favorable to the party opposing the motion, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Margolis*, 140 F.3d at 852. When a district court upholds a restriction on speech, the appellate court conducts an independent, *de novo* examination of the facts. *Tucker v. California Dep't of Educ.*, 97 F.3d 1204, 1209 n. 2 (9th Cir.1996).

## III.

The validity of the District's conduct turns on the nature of the baseball field

fence as a forum for expression. The Supreme Court has held that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The Court employs a forum analysis to evaluate the nature of the property and the corresponding permissible government limitations on expressive activity. *See Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora." *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999).

▮ A traditional public forum, such as a public park or sidewalk, is a place "that has traditionally been available for public expression." *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)(*ISKCON*). Regulation of speech in a traditional public forum is permissible "only if . . . narrowly drawn to achieve a compelling state interest." *Id.* When the government intentionally opens a nontraditional forum for public discourse it creates a designated public forum. *See Children of the Rosary*, 154 F.3d at 976 (citing *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439). Restrictions on expressive activity in designated public fora

---

The Legislature shall make no law respecting an establishment of religion.

**3.** The District Court also held that under the doctrine of res judicata, the judgment in Mr. DiLoreto's state court action barred his federal claims. As Mr. DiLoreto originally brought all claims in one action, and his state and federal actions involve different claims, the doctrine of res judicata does not bar his feder-

al action. *See Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1404 (9th Cir.1993) ("In order to bar a later suit under the doctrine of res judicata, an adjudication must (1) involve the same 'claim' as the later suit, (2) have reached a final judgment on the merits, and (3) involve the same parties or their privies.") (citations omitted). Accordingly, this portion of the District Court's order was in error.

are subject to the same limitations that govern a traditional public forum. *See ISKCON*, 505 U.S. at 678, 112 S.Ct. 2701.

All remaining public property is classified as nonpublic fora. The government may limit expressive activity in nonpublic fora if the limitation is reasonable and not based on the speaker's viewpoint. *Id.* at 679, 112 S.Ct. 2701. The Supreme Court recently has used the term "limited public forum" to refer to a type of nonpublic forum that the government intentionally has opened to certain groups or to certain topics.[4] In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible. *See Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Lamb's Chapel v. Center Moriches Union Free Sch.*, 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

The relevant forum is defined by the access sought by the speaker. *Cornelius*, 473 U.S. at 801, 105 S.Ct. 3439. In this case, the relevant forum is the advertising space on the Downey High School baseball field fence. Mr. DiLoreto contends that the fence was a limited public forum, but it is not clear whether he uses "limited public forum" to refer to a designated public forum subject to heightened scrutiny, or to a type of nonpublic forum that is subject to the reasonableness standard. Mr. DiLoreto concedes in his reply, however, that if the fence is a limited public forum, restrictions on expressive activity are permissible if they are reasonably related to purpose served by the forum and viewpoint neutral. Accordingly, first we must determine whether the fence was a designated public forum subject to heightened scrutiny or a limited public forum subject to the reasonableness standard. Second, we must apply the appropriate standard to the District's actions to determine if they meet constitutional muster.

## A.

"The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. In determining whether the government intended to create a designated public forum, the Supreme Court has considered the nature of the property and its compatibility with expressive activity, as well as the policy and practices of the government. *See id.; see also Children of the Rosary*, 154 F.3d at 976. The question is whether these factors indicate an intent to designate a public forum dedicated to expressive activities.

Government policies and practices that historically have allowed commercial advertising, but have excluded political and religious expression, indicate an intent not to designate a public forum for all expressive activity, but to reserve it for commercial speech. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) ("[A] city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles."); *Children of the Rosary*, 154 F.3d at 978 (finding no public forum when the city consistently enforced policies restricting bus ads to commercial advertising); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 130 (2d (1993) (discussing "public property that is not a designated public forum open for indiscriminate public use"); *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics.").

---

4. The contours of the terms "designated public forum" and "limited public forum" have not always been clear. *Compare Widmar v. Vincent*, 454 U.S. 263, 267, 273, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (discussing designated public forum "generally open for use by student groups") *with Lamb's Chapel v. Center Moriches Union Free School*, 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352

Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998) ("Disallowing political speech, and allowing commercial speech only, indicates that making money is the main goal."). However, where the government historically has accepted a wide variety of advertising on commercial and non-commercial subjects, courts have found that advertising programs on public property were public fora. *See Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transp. Auth.*, 148 F.3d 242, 252 (3d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999) (finding city's practice of permitting virtually unlimited access to forum created designated public forum); *Planned Parenthood Ass'n v. Chicago Transit Auth.*, 767 F.2d 1225, 1230, 1232 (7th Cir.1985) (finding public forum given transit authority's history of accepting controversial public issue advertising).

In addition, where the government acts in a proprietary capacity to raise money or to facilitate the conduct of its internal business, the Supreme Court generally has found a nonpublic forum, subject only to the requirements of reasonableness and viewpoint neutrality. *See Lehman*, 418 U.S. at 303, 94 S.Ct. 2714 ("Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce."); *Cornelius*, 473 U.S. at 805–06, 105 S.Ct. 3439 ("[T]he Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees."); *see also Planned Parenthood v. Clark County School Dist.*, 941 F.2d 817, 824 (9th Cir.1991) (en banc) ("Nor does the evidence suggest that the high schools were 'motivated by an affirmative desire to provide an open forum' for advertising in athletic programs; the schools did not accept advertising for any purpose other than to help defray the costs of this service." (quoting *Cornelius*, 473 U.S. at 805, 105 S.Ct. 3439)).

■ We also "examine[ ] the nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. Generally, "school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public.'" *Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562 (quoting *Perry*, 460 U.S. at 47, 103 S.Ct. 948). *Hazelwood* "constrain[s] the [forum] analysis by requiring that courts focus on unique attributes of the school environment and recognize broadly articulated purposes for which high school facilities may properly be reserved." *Clark*, 941 F.2d at 825 (citing *Hazelwood*, 484 U.S. at 270–73, 108 S.Ct. 562). This takes into account the school's "pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission and avoiding the appearance of endorsing views, no matter who the speaker is." *Id.* at 827, 108 S.Ct. 562.

■ In this case, the District did not intend to designate the baseball field fence as a public forum for expressive activity. The school sold advertising space on the fence to defray athletic program expenses by raising revenue through the Booster Club. As in *Lehman, Children of the Rosary* and *Clark*, the intent of the school in opening the fence to advertising was to raise funds, not to create a forum for unlimited public expression. To raise funds, the District solicited business advertisements, thereby limiting the content of the forum through its solicitation practices. District officials excluded certain subjects from the advertising forum as sensitive or too controversial for the forum's high school context. For example, the District rejected advertisements for alcohol or taverns, as well as an ad for Planned Parenthood. School officials also testified that although they did not personally object to the content of Mr. DiLoreto's ad, they were concerned that allowing the ad would

indiscriminately open the forum to all advertisements regarding personal beliefs. Although not dispositive, the fact that the District screened and rejected the ad is evidence that the District intended to create a limited public forum closed to certain subjects, such as religion. *See Cornelius,* 473 U.S. at 805, 105 S.Ct. 3439 ("The decision of the Government to limit access to the [forum] is not dispositive in itself; instead, it is relevant for what it suggests about the Government's intent in creating the forum.") "This type of selective access does not transform government property into a public forum." *Perry,* 460 U.S. at 47, 103 S.Ct. 948.

The District's practice of excluding certain subjects from the forum distinguishes this case from *Christ's Bride, Chicago Transit Auth.,* and *New York Magazine,* on which Mr. DiLoreto relies. In each of those cases, the city or transit authority controlling the bus sign advertisements historically accepted advertisements on a wide variety of subjects. *See Christ's Bride,* 148 F.3d at 251–52 (holding that virtually unlimited access indicated a public forum); *New York Magazine,* 136 F.3d at 130 (noting a history of accepting political advertising); *Chicago Transit Auth.,* 767 F.2d at 1232 (finding a history of accepting political ads and a wide variety of controversial public issue ads indicated a public forum). In contrast, there is no evidence in the record that any political, religious, or controversial public issue advertising was ever permitted on the Downey High School field fence.

■ The fact that another high school within the District accepted ads for ESP Psychic Readings and the local Freemason organization does not indicate that the Downey High School fence was a designated public forum open to ads promoting personal religious beliefs. The forum is defined by the access sought by the speaker, *see Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439, and Mr. DiLoreto only sought access to the Downey High School field fence. The ESP and Freemason signs

appeared in a different forum, and nothing in the record demonstrates that the two advertising programs were the same. In addition, ESP Psychic Readings, which advertised its number as 1–800–PSYCHIC, is a commercial enterprise and the Freemasons are "an international fraternal and charitable organization." *Webster's II New College Dictionary* 446 (1995). Neither ad contains a religious, or anti-religious, message, and therefore neither is similar to Mr. DiLoreto's sign.

Under these circumstances, we hold that the baseball field fence was a nonpublic forum open for a limited purpose. Accordingly, the District's conduct need only be reasonable in light of the purpose served by the forum and viewpoint neutral to be permissible. *See Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *Lamb's Chapel,* 508 U.S. at 392–93, 113 S.Ct. 2141.

### B.

■ In a nonpublic forum opened for a limited purpose, restrictions on access "can be based on subject matter ... so long as the distinctions drawn are reasonable in light of the purpose served by the forum" and all the surrounding circumstances. *Cornelius,* 473 U.S. at 806, 809, 105 S.Ct. 3439; *see also Perry,* 460 U.S. at 49, 103 S.Ct. 948. The "reasonableness" analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated. *See Perry,* 460 U.S. at 50–51, 103 S.Ct. 948. For example, in *United States v. Kokinda,* 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion), the Supreme Court held that prohibiting solicitation on postal property was reasonable because the purpose of the forum (a sidewalk from the parking lot to the post office) was to accomplish the most efficient postal delivery system. In *Perry,* the Court held that denying access to the school's internal mail system to unions other than the school's official bargaining unit was reasonable given the school's purpose to use the mail system for communication of school busi-

ness, and to prevent the system from becoming a battlefield for competing unions. *Perry*, 460 U.S. at 51–52, 103 S.Ct. 948. In *Lehman*, the Court held that the city's decision to exclude political advertising from bus signs was reasonable given the city's desire to generate revenue and the potential for "lurking doubts about [political] favoritism, and sticky administrative problems ... in parceling out limited space to eager politicians." *Lehman*, 418 U.S. at 304, 94 S.Ct. 2714 (plurality opinion). Accordingly, even though the actual forum in this case is the advertising space on the fence, the special nature and function of public secondary schools are relevant to evaluating the limits the school may impose on expressive activity. *See Cornelius*, 473 U.S. at 801–02, 105 S.Ct. 3439 (holding that although the forum was the charitable drive itself, the court could consider the special nature and function of the federal workplace in evaluating limits on access).

The District essentially offers two reasons for excluding the subject of religion from the forum. The District's first concern was disruption. The District feared controversy and expensive litigation that might arise from community members seeking to remove the sign or from religious or political statements that others might wish to post. The District's second concern was the potential Establishment Clause violation presented by posting the Ten Commandments in a public high school.

■■■ The District's concerns regarding disruption and potential controversy are legitimate reasons for restricting the content of the ads, given the purpose of the forum and the surrounding circumstances of the public secondary school. *See Cornelius*, 473 U.S. at 810, 105 S.Ct. 3439 (citing *Perry*, 460 U.S. at 52 n. 12, 103 S.Ct. 948) ("[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."). We held in *Clark* that a public high school's "decision not to promote or sponsor speech ... which might

place it on one side of a controversial issue, is a judgment call which *Hazelwood* reposes in the discretion of school officials and which is afforded substantial deference." *Clark*, 941 F.2d at 829 (citing *Hazelwood*, 484 U.S. at 273 & n. 7, 108 S.Ct. 562). We recognized that a public secondary school has legitimate concerns "such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission, and avoiding the appearance of endorsing views" that render a school's restriction on advertising reasonable. *Id.*, at 827. Therefore, we concluded that a public secondary school could restrict advertising of controversial topics in programs for high school athletic events, even where the school has created a limited public forum for other advertisements. *See id.* at 829–30. The Supreme Court also has recognized that content-based restrictions may be reasonable "in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." *Lehman*, 418 U.S. at 304, 94 S.Ct. 2714.

In this case, the testimony of the District officials makes clear their concern that posting Mr. DiLoreto's ad would force the District to open the forum to all expressions of personal beliefs. The school used the athletic field for physical education classes and for school-sponsored sporting events. The District reasonably could have believed that the controversy and distraction created by political and religious messages raised the potential for disruption of these classes and school-sponsored events, particularly as students at these activities would be a captive audience to the ads. In addition, the District reasonably could have been concerned that the school would be associated with any controversial views expressed in the advertisements on the fence. *See Clark*, 941 F.2d at 827.

Mr. DiLoreto contends that the purpose of the advertising forum was to raise funds for the Booster Club, and that posting his sign would not interfere with that purpose.

However, as the California Court of Appeal noted in the parallel California proceeding, even if the District successfully defeated any challenges to the posting of this sign, or others to which the District would have been required to provide equal access, that litigation would have cost the District money, depriving it of the financial benefit the advertising forum was intended to provide. Accordingly, we find that the District's decision to exclude ads on certain subjects, including religion, was reasonable given the District's concerns regarding disruption and controversy.[5]

Since we find the District's decision reasonable on this basis, we do not address its concern over the potential Establishment Clause consequences of posting the ad.

### C.

▪ Although the District's decision not to post the ad was reasonable in light of the purpose served by the forum, it may still violate the First Amendment if it discriminates on the basis of viewpoint, rather than content. *See Cornelius*, 473 U.S. at 811, 105 S.Ct. 3439. This distinction "is not a precise one." *Rosenberger*, 515 U.S. at 831, 115 S.Ct. 2510. Permissible content-based restrictions exclude speech based on topic, such as politics or religion, regardless of the particular stand the speaker takes on the topic. *See, e.g., Children of the Rosary*, 154 F.3d at 981 (finding that limiting the forum to commercial ads was a permissible content-based restriction). In contrast, impermissible viewpoint discrimination is a form of content discrimination in which the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510.

▪ Mr. DiLoreto contends that his advertisement was compatible with the purposes of the forum, and that even if the District limited the forum to commercial advertising, his sign was a business advertisement. Nothing in the record, however, indicates that the District opened the forum to the subject of religion. Given the potential for disruption and controversy, the District was justified in excluding that subject from the forum. As the Supreme Court noted in *Perry*,

> [i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purposes of the property.

*Perry*, 460 U.S. at 49, 103 S.Ct. 948. Unlike the other signs that were posted on the fence, Mr. DiLoreto's sign does not advertise, or even mention, a business. Mr. DiLoreto's ad was not a statement addressing otherwise-permissible subjects from a religious perspective; it sets forth the Ten Commandments, which are "undeniably a sacred text in the Jewish and Christian faiths," and "concern[ ] the religious duties of believers. . . ." *Stone*, 449 U.S. at 41–42, 101 S.Ct. 192. We conclude that the District's decision not to post Mr. DiLoreto's sign was pursuant to a permissible, content-based limitation on the forum, and not viewpoint discrimination.

▪ We do not accept *amicus curiae* The Becket Fund for Religious Liberty's view that excluding religion as a subject or category from a forum always constitutes viewpoint discrimination. This argument mischaracterizes the holding in *Rosenberger*, which involved the University of Virgi-

---

5. The Supreme Court has made clear that the question whether the First Amendment requires a school to tolerate certain speech, such as the speech of students, is different from the question whether the First Amendment requires a school to promote or endorse another's speech. *See Hazelwood*, 484 U.S. at 270–71, 108 S.Ct. 562. Thus the circumstances here are distinguishable from the school's attempt to prohibit student speech in *Tinker v. Des Moines Independent Comm. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

nia's decision to withhold payment of printing costs from a student publication that discussed student life from a Christian perspective. The Court merely held that refusing to fund only religious viewpoints on otherwise-permissible subjects (*i.e.* pregnancy or homosexuality) was viewpoint discrimination. Indeed, the Court explicitly based its decision on the fact that "the University [did] not exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Rosenberger*, 515 U.S. at 831, 115 S.Ct. 2510; *see also Lamb's Chapel*, 508 U.S. at 393–94, 113 S.Ct. 2141 (holding that permitting presentation of all views regarding family issues except those dealing with the otherwise-permissible subject matter from a religious perspective constituted viewpoint discrimination).

▬ Nor do we believe that the Constitution prohibited the school from closing the forum in response to appellant's ad. The government has an inherent right to control its property, which includes the right to close a previously open forum. *See Capitol Square*, 515 U.S. at 783–84, 115 S.Ct. 2440 ("The fact that the capitol lawn has been the site of public protests and gatherings, and is the location ·of any number of the government's own unattended displays ... does not disable the State from closing the square to all privately owned, unattended structures.") (Souter, J., concurring in the judgment); *see also Perry*, 460 U.S. at 46, 103 S.Ct. 948 ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum."). Closing the forum is a constitutionally permissible solution to the dilemma caused by concerns about providing equal access while avoiding the appearance of government endorsement of religion. *See Chabad–Lubavitch of Georgia v. Miller*, 5 F.3d 1383, 1394 (11th Cir.1993)(en banc) ("If Georgia fears that it would violate the Establishment Clause

by allowing the [religious] display, it can avoid the perception that it is endorsing a religion by ... closing the [public] forum altogether ...."); *see also Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1290 (7th Cir.1996) (holding that closing a forum to all displays to avoid displaying a religious symbol was not unconstitutional). Accordingly, the fact that the District chose to close the forum rather than post Mr. DiLoreto's advertisement and risk further disruption or litigation does not constitute viewpoint discrimination.

### CONCLUSION

We AFFIRM the district court's grant of summary judgment to the appellees on the grounds set forth above. That portion of the district court's order addressing res judicata is VACATED.