Dear Superintendent Dressel:
I am in receipt of your request for an Attorney General's opinion on behalf of the St. Mary Parish School Board wherein you seek an opinion concerning the following situation:
 I enclose a copy of a written lease between the St. Mary Parish School Board and the City of Morgan City. The lease has now expired and is continuing on a month-to-month basis while the parties negotiate a renewal. The City of Morgan City has constructed a grandstand and two softball fields on the leased premises. The Morgan City Senior High girls softball team uses one of the fields for its home softball games. The Central Catholic High School girls softball team uses the other field for its home softball games. The Council of the City of Morgan City has recently voted to allow Central Catholic High School to place permanent signage on the field used by it identifying the field as the home park of its girls softball team for the duration of the season. In the past, only temporary signage had been used when the park was being used by Central Catholic High School.
Specifically, you seek an opinion on the following question:
 Does the use by Central Catholic High School of the field constructed by the City of Morgan City on property belonging to the St. Mary Parish School Board constitute a violation of separation of church and state when Central Catholic is allowed to place permanent signage on the field identifying it as its home park?
The First Amendment to the Constitution of the United States provides in pertinent part as follows:
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, . . .
Similarly, the Constitution of the State of Louisiana at ArticleI, Section 8 provides:
 No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof.
In Diloreto v. Downey Unified School District Board of Education,196 F.3d 958 (Aug. 4, 1999), a would-be advertiser sued the superintendent of the school district and two members of the board of education based on the district's refusal to post a paid advertisement containing the text of the Ten Commandments on a high school's baseball field fence alleging violation of his right to free speech. As discussed in Diloreto,
 The validity of the District's conduct turns on the nature of the baseball field fence as a forum for expression. The Supreme Court has held that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The Court employs a forum analysis to evaluate the nature of the property and the corresponding permissible government limitations on expressive activity. See Cornelius v. NAACP Legal Defense Educ. Fund, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567
(1985). "Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora." Children of the Rosary v. City of Phoenix, 154 F.3d 972, 976 (9th Cir. 1998), cert. denied, ___ U.S. ___, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999).
 [7][8] A traditional public forum, such as a public park or sidewalk, is a place "that has traditionally been available for public expression." International Soc'y for Krishna Consciousness, Inc. v. Lee 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (ISKCON). Regulation of speech in a traditional public forum is permissible "only if . . . narrowly drawn to achieve a compelling state interest." Id. When the government intentionally opens a nontraditional forum for public discourse it creates a designated public forum. See Children of the Rosary, 154 F.3d at 976 (citing Cornelius, 473 U.S. at 802, 105 S.Ct. 3439). Restrictions on expressive activity in designated public fora *965 are subject to the same limitations that govern a traditional public forum. See ISKCON, 505 U.S. at 678, 112 S.Ct. 2701.
 [9][10] All remaining public property is classified as nonpublic fora. The government may limit expressive activity in nonpublic fora if the limitation is reasonable and not based on the speaker's viewpoint. Id. At 679, 112 S.Ct. 2701. The Supreme Court recently has used the term "limited public forum" to refer to a type of nonpublic forum that the government intentionally has opened to certain groups or to certain topics. [FN4] In a limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible. See Rosenberger v. Rector Visitors of the Univ. Of Virginia, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700
(1995); Lamb's Chapel v. Center Moriches Union Free Sch., 508 U.S. 384, 392-93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).
In Cornelius, supra, at pg. 3452, the court stated:
 The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation. In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated.
 . . .
 Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. See United States Postal Service v. Council of Greenburgh Civic Assns., 453 U.S., at 129, 101 S.Ct., at 2685.
 . . .
In Diloreto, the court stated:
 Generally, "school facilities may be deemed to be public forums only if school authorities have `by policy or by practice' opened those facilities `for indiscriminate use by the general public.'" Hazelwood, 484 U.S. at 267, 108 S.Ct. 562 (quoting Perry, 460 U.S. at 47, 103 S.Ct. 948). Hazelwood "constrain[s] the [forum] analysis by requiring that courts focus on unique attributes of the school environment and recognize broadly articulated purposes for which high school facilities may properly be reserved." Clark, 941 F.2d at 825 (citing Hazelwood, 484 U.S. at 270-73, 108 S.Ct. 562). This takes into account the school's "pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission and avoiding the appearance of endorsing views, no matter who the speaker is." Id. at 827, 108 S.Ct. 562.
As discussed in Clark, supra, at pg. 824,
 High schools foster learning experiences inside and outside the classroom and serve pedagogical as well as locus parent purposes. For this reason, educators have the right to control expressive activity that students, parents and other members of the public "might reasonably perceive to bear the imprimatur of the school."
As later discussed in Clark, supra, at pg. 828,
 A school's decision not to promote or sponsor speech that is unsuitable for immature audiences, or which might place it on one side of a controversial issue, is a judgment which Hazelwood reposes in the discretion of school officials and which is afforded substantial difference.
In Diloreto, the Court held that the District did not intend to designate the baseball field fence as a public forum for expressive activity. The school sold advertising space on the fence to defray athletic program expenses by raising revenue through the Booster Club. The Court held that the intent of the school in opening the fence to advertising was to raise funds, not to create a forum for unlimited public expression. The Court found that the District officials excluded certain subjects from the advertising forum as sensitive or too controversial for the forum's high school context. The Court found that there was no evidence in the record that any political, religious, or controversial public issue advertising was ever permitted at the high school field in question. Therefore, the Court held that the baseball field fence was a nonpublic forum open for a limited purpose. The Court concluded that the district's conduct need only be reasonable in light of the purpose served by the forum and viewpoint neutral to be permissible.
The District offered two reasons for excluding the subject of religion from the forum. The District's first concern was disruption. The District feared controversy and expensive litigation that might arise from community members seeking to remove the sign or from religious or political statement that others might wish to post. The District's second concern was the potential establishment clause violation presentation by posting the Ten Commandments in a public high school.
Concerning these two reasons, the Court held:
 The District's concerns regarding disruption and potential controversy are legitimate reasons for restricting the content of the ads, given the purpose of the forum and the surrounding circumstances of the public secondary school. See Cornelius, 473 U.S. at 810, 105 S.Ct. 3439 (citing Perry, 460 U.S. at 52 n. 12, 103 S.Ct. 948) ("[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."). We held in Clark that a public high school's "decision not to promote or sponsor speech . . . which might place it on one side of a controversial issue, is a judgment call which Hazelwood reposes in the discretion of school officials and which is afforded substantial deference." Clark, 941 F.2d at 829 (citing Hazelwood, 484 U.S. at 273 n. 7, 108 S.Ct. 562). We recognized that a public secondary school has legitimate concerns "such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission, and avoiding the appearance of endorsing views" that render a school's restriction on advertising reasonable. Id., at 827. Therefore, we concluded that a public secondary school could restrict advertising of controversial topics in programs for high school athletic events, even where the school has created a limited public forum for other advertisements. See Id. At 829-30. The Supreme Court also has recognized that content-based restrictions may be reasonable "in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." Lehman, 418 U.S. at 304, 94 S.Ct. 2714.
The court found the District's decision reasonable on this basis and therefore did not address its concern over the potential Establishment Clause consequences of posting the ad. The Court continued by stating:
 Although the District's decision not to post the ad was reasonable in light of the purpose served by the forum, it may still violate the First Amendment if it discriminates on the basis of viewpoint, rather than content. See Cornelius, 473 U.S. at 811, 105.S.Ct. 3439. This distinction "is not a precise one." Rosenberger, 515 U.S. at 831, 115 S.Ct. 2510. Permissible content based restrictions exclude speech based on topic, such as politics or religion, regardless of the particular stand the speaker takes on the topic. See, e.g., Children of the Rosary, 154 F.3d at 981 (finding that limiting the forum to commercial ads was a permissible content-based restriction). In contrast, impermissible viewpoint discrimination is a form of content discrimination in which the government "targets not subject matter, but particular views taken by speakers on a subject." Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510.
In your request, you inquire whether any restrictions exist for a parochial school placing permanent signage on property that is owned by the school board but leased to another public body. It must be noted that signage on a field for the duration of a season is not permanent signage.
The Equal Access Clause found at 20 U.S.C. § 4071 provides in relevant part the following:
 (a) Restriction of limited open forum on basis of religious, political, philosophical, or other speech content prohibited
 It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.
 (b) "Limited open forum" defined
 A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.
 20 U.S.C. § 4071(a)-(b).
 (c) Fair opportunity criteria
 Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that —
 (1) the meeting is voluntary and student-initiated;
 (2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;
 (3) employees or agents of the school or government are present at religious meetings only in a nonparticipatory capacity;
 (4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school; and
 (5) nonschool persons may not direct, conduct control, or regularly Sattend activities of student groups.
 (d) Construction of subchapter with respect to certain rights
 Nothing in this subchapter shall be construed to authorize the United States or any State or political subdivision thereof —
 (1) to influence the form or content of any prayer or other religious activity;
 (2) to require a person to participate in prayer or other religious activity;
 (3) to expend public funds beyond the incidental cost of providing the space for student-initiated meetings:
 (4) to comply school agent or employee to attend a school meeting if the content of the speech at the meeting is contrary to the beliefs of the agent or employee;
 (5) to sanction meetings that are otherwise unlawful;
 (6) to limit the rights of groups of students which are not of a specified numerical size; or
 (7) to abridge the constitutional rights of any person.
As discussed in Mergens v. Board of Education of the WestsideCommunity Schools, 867 F.2d 1076,
 The EAA is only applicable to those federally assisted public secondary schools which maintain a "limited open forum" as defined by the AcA public secondary school may properly exclude a student club on the basis of the content of the club's speech only if the school maintains a closed forum — that is, if all of the other student clubs are curriculum related. If even one noncurriculum-related student club is allowed, the school maintains a limited open forum as defined by the EAA and cannot deny the club access to school premises during noninstructional time on the basis of the content of the club's speech.
In Mergens, the Eight Circuit Court of Appeals held that:
 To determine whether an "equal access" policy at the university allowing registered student religious groups to meet would offend the establishment clause, the Court applied the three-part test from Lemon v. Kurtzsman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (Lemon) Under the Lemon test, a policy or statute is constitutionally sound if: (1) it has a "secular . . . purpose," (2) "its . . . primary . . . effect . . . neither advances nor inhibits religion," and (3) it does not "foster `an excessive government entanglement with religion.' " Id. (citation omitted).
Our office is uncertain as to the content of the sign that would be allowed by Central Catholic High School on the field identifying it as its home park. Assuming that the sign does not violate any content based restrictions and is not proselytizing, the Equal Access Clause requires the softball teams to be treated equally. Therefore, there would be no restrictions that exist that prohibit a parochial school from placing a sign on the field identifying it as its home park and no violation of church and state.
Also, the new lease between the Parish School Board of St. Mary Parish and the Mayor and Councilmen of Morgan City should be reviewed to determine whether the lease indicates which entity has the authority to decide who to lease the property to. The language in the old lease appears to have given the Mayor and Councilmen of Morgan City the authority to decide who to lease the property to which would have included determining whether Central Catholic High School should have been allowed to place permanent signage on the field identifying it as its home park.
I hope this opinion has sufficiently addressed your concerns. If I can be of further assistance, please let me know.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 By: __________________________ BETH CONRAD LANGSTON Assistant Attorney General
RPI/BCL/sc