# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHRYN NURRE,
          *Plaintiff-Appellant,*

          v.

CAROL WHITEHEAD, in her official
and individual capacity as the
Superintendent of Everett School
District No. 2,
          *Defendant-Appellee.*

No. 07-35867

D.C. No.
CV-06-00901-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Chief District Judge, Presiding

Argued and Submitted
January 22, 2009—Seattle, Washington

Filed September 8, 2009

Before: Robert R. Beezer, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by
Judge Milan D. Smith, Jr.

12731

## COUNSEL

W. Theodore Vander Wel, Vander Wel & Jacobson, Bishop & Kim, PLLC, Bellevue, Washington, for the appellant.

Michael A. Patterson, Patterson Buchanan Fobes Leitch & Kalzer, PS, Seattle, Washington, for the appellees.

Phylis Skloot Bamberger; Marc D. Stern; Zhubin Parang, Sonnenschein Nath & Rosenthal LLP; for amicus curiae American Jewish Congress.

Ayesha N. Khan, Richard B. Katskee, Nancy Leong, for amicus curiae Americans United for Separation of Church and State.

Steven W. Fitschen, Barry C. Hodge, Nathan A. Driscoll, for amicus curiae The National Legal Foundation.

Francisco M. Negrón, Jr., Thomas E.M. Hutton, for amicus curaie National School Boards Association.

## OPINION

TALLMAN, Circuit Judge:

Once again we enter the legal labyrinth of a student's First Amendment right to free speech. There exists a delicate balance between protecting a student's right to speak freely and

necessary actions taken by school administrators to avoid collision with the Establishment Clause. While finding our way is never easy, we here endeavor to provide guidance to assist both school districts and their students.

Kathryn Nurre ("Nurre") sought to perform an instrumental version of "Ave Maria"[1] at her public high school's graduation ceremony. Dr. Carol Whitehead ("Whitehead"), superintendent of Everett School District No. 2 (the "District"), in which Nurre's high school is located, declared that the piece could not be played at the ceremony because it could be seen as endorsing religion. Nurre subsequently sued Whitehead in both her individual and official capacities for alleged violations of Nurre's First and Fourteenth Amendment rights. Nurre now appeals dismissal of her civil rights claims brought under 42 U.S.C. § 1983.

Supreme Court precedent and the law of our circuit counsel us to find that there was no violation of Nurre's constitutional rights. Therefore, we affirm the ruling of the district judge.

# I

Everett School District No. 2 is a large western Washington school district consisting of twenty-five individual schools. The Henry M. Jackson High School[2] ("JHS") is one of three high schools within the District. JHS conducts an annual graduation ceremony featuring speakers, musical selections, a presentation of diplomas, and a ceremonial tassel turn led by one designated student. All graduation ceremonies are sanctioned by the District and held at the local convention center in Everett.

---

[1]"Ave Maria" is Latin for "Hail Mary," and was written by Franz Biebl to put to music the words of a well known Roman Catholic prayer.

[2]Named in honor of Everett's native son, former United States Congressman and Senator Henry M. "Scoop" Jackson.

Prior to the 2005 graduation ceremony, newly-hired JHS principal Terry Cheshire ("Cheshire") reviewed the titles of all musical selections to be performed for the audience of students, family, and friends. Seeing no issue with any piece proposed by the school's musical directors, Cheshire approved the performance of all requested selections. At graduation, the student choir performed "Up Above My Head," a vocal piece which included express references to "God," "heaven," and "angels." Immediately following graduation, the District received complaints from graduation attendees regarding the religiously-themed musical selections, and the local newspaper, *The Everett Herald*, printed indignant letters to the editor complaining about religious statements included in the ceremony's music performed before the audience.

As the 2006 graduation neared, Cheshire again previewed the titles to each ensemble's musical selections for the ceremony. In keeping with her three-year tradition, the high school band director, Leslie Moffat ("Moffat"), permitted the graduating members of her Wind Ensemble to select a piece from their musical repertoire which they wished to perform during the ceremony. Though all three previous classes had selected "On a Hymnsong of Philip Bliss," the 2006 graduates, including Nurre, chose instead to perform "Ave Maria," which they believed showcased their talent and the culmination of their instrumental work. Moffat sent this title and other graduation selections—including, *inter alia*, "Pomp and Circumstance"—to Cheshire for approval. Cheshire immediately recognized "Ave Maria" as a religious piece. Recalling prior complaints over the 2005 religious musical selection, instead of approving them, he forwarded the lists on to the District's associate superintendent Karst Brandsma ("Brandsma").

District administrators, including Brandsma and Whitehead, then held a meeting to determine the appropriateness of performing "Ave Maria" at the JHS graduation. They determined that because the title and meaning of the piece had reli-

gious connotations—and would be easily identified as such by attendees merely by the title alone—they would ask the Wind Ensemble to select another piece. Brandsma then sent an e-mail to all principals in the District explaining that musical selections for all graduations within the District should be purely secular in nature. The e-mail also reminded the principals that while District policies typically permitted performance of religious music at mid-year concerts—so long as it was performed for its artistic value and alongside an equal number of other non-religious works—graduation was a unique event where such contemporaneous balanced performances were impracticable. Following this direction, Nurre and the other senior Wind Ensemble members reluctantly elected to perform the fourth movement of Gustav Holst's "Second Suite in F for Military Band."

Nurre filed suit in the Western District of Washington bringing three 42 U.S.C. § 1983 claims alleging violations of her rights under the First Amendment and the Equal Protection Clause. In 2007, the district court held that Whitehead was immune from suit under the doctrine of qualified immunity. *Nurre v. Whitehead*, 520 F. Supp. 2d 1222, 1240 (W.D. Wash. 2007). The court also found that the District had not violated any of Nurre's constitutionally protected rights, and therefore no municipal liability could attach to the District through Whitehead in her official capacity. *Id.* at 1228-36, 1240-42. All claims for injunctive relief were dismissed because those claims became moot upon Nurre's graduation from JHS. *Id.* at 1226. Nurre timely appeals.

## II

We review a district court's grant of summary judgment de novo. *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008). In determining whether summary judgment was appropriate, we view the evidence in the light most favorable to Nurre, the non-moving party. *Id.* A grant of summary judgment is inappropriate if there is "any genuine issue of

material fact or the district court incorrectly applied the substantive law." *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007).

**III**

All § 1983 claims must be premised on a constitutional violation. *See Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997) ("To state a claim for relief under section 1983, the Plaintiffs must plead two essential elements: 1) that the Defendants acted under color of state law; and 2) that the Defendants caused them to be deprived of a right secured by the Constitution and laws of the United States.") (citing *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir. 1983)). If the government official, in this case Superintendent Whitehead, did not violate the claimant's rights under the Constitution, no relief lies within the statute, whether the official is sued in her individual or official capacity.[3] 42 U.S.C. § 1983. Because we hold that Nurre's rights were not violated, her action against Whitehead must fail.

---

[3]If, as our colleague Judge Milan Smith contends, Whitehead had violated Nurre's constitutional rights, we would then need to determine whether she was protected by qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982). We agree with Judge Smith that the state of the law is such that no reasonable school administrator would have known that such action would violate constitutional rights and qualified immunity would attach to Whitehead. Because qualified immunity does not apply to municipalities, we would then have to determine under *Monell* whether the Everett School District is liable for acts taken in furtherance of district policy by Whitehead. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination*, 507 U.S. 163, 166-167 (1993); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 693 (1978) (holding that local governments and their entities may be sued when an "official policy is responsible for a deprivation of rights protected by the Constitution"). However, because there was no constitutional violation in this case —a prerequisite for finding liability against either the superintendent or the school district—we need not determine whether qualified immunity applies or municipal liability attaches.

Nurre first claims that Whitehead censored her speech—i.e., her performance of instrumental music—in violation of the First Amendment's protection of free speech. Second, she claims that Whitehead acted with hostility toward religion in violation of the First Amendment's Establishment Clause. Finally, she argues that in treating her and her classmates differently than past JHS graduating classes, Whitehead violated the Equal Protection Clause of the Fourteenth Amendment. We examine each in turn.

## A

**[1]** The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. It is applicable to the states through the Fourteenth Amendment, and the Supreme Court has, on multiple occasions, reminded us that "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' " *Morse v. Frederick*, 551 U.S. 393, 127 S. Ct. 2618, 2622 (2007) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969)). However, our precedent also recognizes that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), and that students' rights "must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotation marks and citation omitted).

**[2]** As a threshold matter, we first decide whether the music Nurre sought to perform constitutes protected speech. It is clear to us that purely instrumental music—i.e., music with no lyrics—is speech. In *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989), the Supreme Court noted that "[m]usic is one of the oldest forms of human expression," and "as a form of expression and communication, [it] is protected under the First Amendment." And, in *Hurley v. Irish-American Gay,*

*Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995), the Court explained that "the Constitution looks beyond written or spoken words as mediums of expression," and protects, under the First Amendment, the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." Then, in *White v. City of Sparks*, 500 F.3d 953, 955 (9th Cir. 2007), we said that both "arts and entertainment constitute protected forms of expression," including "music without words." Nurre and her classmates sought to perform an entirely instrumental arrangement of Franz Biebl's "Ave Maria,"[4] which we hold is speech as contemplated by the First Amendment.

However, our determination that the requested performance would have been speech does not end our inquiry. The next question is whether Nurre's right to engage in that speech was in some way abridged. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). Therefore, we must determine the type of forum created by the government when Nurre sought to perform "Ave Maria"—that is, the relevant forum—and then assess whether the District's restriction was constitutionally permissible in light of that forum.

First, while schools are typically non-public fora, they may become a public forum "if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." *Hazelwood*, 484 U.S. at 267 (quot-

---

[4]While Franz Biebl's "Ave Maria" does include words to the well-known prayer, and the arrangement available for high school wind ensemble includes them between each staff in the score, Moffat had the Wind Ensemble perform the piece *sans* lyrics.

ing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 n.7, 47 (1983)). Nurre does not claim that a school, or even a graduation ceremony, is normally anything but a non-public forum. Instead, she argues that school administrators created, in this instance, a "limited public forum" by permitting students to select musical pieces to perform during graduation. "[T]he term 'limited public forum' . . . refer[s] to a type of nonpublic forum that the government intentionally has opened to certain groups or to certain topics." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999).

[3] We have never definitively determined what forum is created when a school district holds graduation, or, as in this case, when part of the graduation ceremony presents student-selected work.[5] However, we need not answer the question, as the District does not challenge Nurre's contention that a limited public forum existed here. Instead, it simply argues that the restriction placed on Nurre was reasonable in light of the purpose served by graduation ceremonies. Therefore, we assume, without deciding, that a limited public forum was created.

---

[5]Though we considered student speech at graduation in both *Lassonde v. Pleasanton Unified School District*, 320 F.3d 979 (9th Cir. 2003), and *Cole v. Oroville Union High School District*, 228 F.3d 1092 (9th Cir. 2000), we did not find those cases appropriate for making a forum determination. Instead, we held there that the dangers of entangling religious speech into a convocation where the audience was essentially captive and composed of impressionable adolescents outweighed the individual's interest in presenting proselytistic speech. *Lassonde*, 320 F.3d at 983; *Cole*, 228 F.3d at 1101. *See also Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 799 (9th Cir. 1999) (en banc) (dismissing for lack of jurisdiction suit against school district for censorship of graduation speech); *Harris v. Joint Sch. Dist. No. 241*, 41 F.3d 447 (9th Cir. 1994), *cert. granted and judgment vacated* 515 U.S. 1154 (1995), and *cert. granted and judgment vacated sub nom. Citizens Pres. Am.'s Heritage, Inc. v. Harris*, 515 U.S. 1155 (1995) (where the Supreme Court ordered the case dismissed as moot, including, *inter alia*, the lower court's holding regarding forum at a graduation).

Second, we must align the proper constitutional test with the forum created. "In a nonpublic forum opened for a limited purpose, restrictions on access 'can be based on subject matter . . . so long as the distinctions drawn are reasonable in light of the purpose served by the forum' and all the surrounding circumstances." *DiLoreto*, 196 F.3d at 967 (alterations in original) (quoting *Cornelius*, 473 U.S. at 806, 809); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-93 (1993). "The 'reasonableness' analysis focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated." *Id*. For example, in *DiLoreto*, we found that a District's concern regarding disruption and controversy were legitimate reasons for restricting content, given the fact that the forum was a fence at a high school baseball park and the audience included impressionable adolescents in a school setting. 196 F.3d at 697. The Third Circuit has also recognized that a school acts reasonably when it takes steps to avoid controversy or maintain an appearance of neutrality. *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1122 (3d Cir. 1992) (citing *Cornelius*, 473 U.S. at 811) (noting, in remanding to the district court for further fact finding, that a consent-decree provision which expressly restricts a student's proselytistic speech at graduation might be a valid restriction in a limited public forum); *Student Coal. for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Dirs.*, 776 F.2d 431, 437 (3d Cir. 1985) (where the court held that banning the use of school facilities for an anti-nuclear exposition was a reasonable restriction on a student organization when the school acted to both avoid political controversy and appear neutral).

**[4]** Here, the District was acting to avoid a repeat of the 2005 controversy by prohibiting any reference to religion at its graduation ceremonies. District administrators recognized the evident religious nature of "Ave Maria" and took into consideration the compulsory nature of a graduation ceremony. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 115

(2001) ("[W]e conclude[ ] that attendance at the graduation exercise was obligatory."); *Lassonde*, 320 F.3d at 985 ("The graduation ceremony was a school-sponsored function that all graduating seniors could be expected to attend."). Furthermore, the District's policies regarding religious musical performance at traditional concerts evidence a desire to remain neutral with regard to all religions, and perform pieces for their artistic value alongside other comparable selections. While these ceremonies are held to celebrate and showcase students' achievements, the practical limitations of a graduation ceremony preclude performance of comparable pieces.

**[5]** Contrary to Judge Milan Smith's understanding of our holding, we do not seek to remove all religious musical work from a school ensemble's repertoire. Nor do we intend to substantially limit when such music may be played. We agree with him that religious pieces form the backbone of the musical arts. To ignore such a fact would be to dismiss centuries of music history. Instead, we confine our analysis to the narrow conclusion that when there is a captive audience at a graduation ceremony, which spans a finite amount of time, and during which the demand for equal time is so great that comparable non-religious musical works might not be presented, it is reasonable for a school official to prohibit the performance of an obviously religious piece.

**[6]** We therefore hold that the District's action in keeping all musical performances at graduation "entirely secular" in nature was reasonable in light of the circumstances surrounding a high school graduation, and therefore it did not violate Nurre's right to free speech.[6]

---

[6]We note that this is not a case involving viewpoint discrimination, which would be impermissible no matter the forum. Nurre concedes that she was not attempting to express any specific religious viewpoint, but that she sought only to "play a pretty piece." *See Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but *particular views taken by speakers* on a subject, the violation of the First Amendment is [viewpoint discrimination] . . . . The government must abstain from regulating speech when the *specific motivating ideology or the opinion or perspective of the speaker* is the rationale for the restriction." (emphases added)).

## B

**[7]** Nurre next claims that the District violated the Establishment Clause of the First Amendment by acting in a manner hostile toward religion. The Supreme Court has explained that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). We apply the traditional test set forth by the Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to determine whether the District has acted with hostility toward religion. *Catholic League v. San Francisco*, 567 F.3d 595, 599 (9th Cir. 2009); *see also Am. Family Ass'n, Inc. v. San Francisco*, 277 F.3d 1114, 1121 (9th Cir. 2002), *cert. denied*, 537 U.S. 886 (2002) ("Although the *Lemon* test is perhaps most frequently used in cases involving government allegedly giving *preference* to a religion, the *Lemon* test accommodates the analysis of a claim brought under a hostility to religion theory as well.").

The *Lemon* test analyzes whether the government's actions have offended the Establishment Clause. In order for governmental conduct to survive the test, and therefore be found to not violate the Clause, the conduct must (1) have a secular purpose, (2) not have as its principal or primary effect the advancement or inhibition of religion, and (3) not foster an excessive governmental entanglement with religion. *Lemon*, 403 U.S. at 612-13.

### 1

**[8]** "The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). Here, we look to see whether the "government acts with the ostensible and predominant purpose" of inhibiting religion. *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005). "A reviewing court must be 'reluctant to attribute

unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner*, 1 F.3d at 782 (quoting *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983)). We have made it clear that "[g]overnmental actions taken to avoid potential Establishment Clause violations have a valid secular purpose under *Lemon*." *Vasquez v. L.A. County*, 487 F.3d 1246, 1255 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 711 (2007). Any other standard would prove unworkable. *Id*.

**[9]** The District admitted, and Nurre does not contest, that it prohibited the Wind Ensemble's performance of "Ave Maria" in an effort to avoid conflict with the Establishment Clause.[7] Therefore we find the first prong of the *Lemon* test satisfied.

### 2

The second prong of the *Lemon* test requires us to determine if the District's action has a "principal or primary effect . . . that . . . advances [or] inhibits religion." 403 U.S. at 612. "Governmental action has the primary effect of advancing or disapproving of religion if it is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Vasquez*, 487 F.3d at 1256 (internal citation and quotation marks omitted). This is an objective test, asking whether a reasonable observer who is "informed . . . [and] familiar with the history of the government practice at issue," would perceive the action as having a predominately non-secular effect. *Id*. (alteration in original) (internal citation and quotation marks omitted). As we noted in *Catholic League*, "whereas in the purpose inquiry, we are reluctant to attribute unconstitutional motives to government

---

[7]We part ways with Judge Smith's determination that Whitehead did not act to avoid an Establishment Clause violation. There was no evidence in the record to suggest any other reason for her action to apply the district's neutrality policy.

actors in the face of a plausible secular purpose, no such presumption applies in the effects analysis." 567 F.3d at 604 n.9 (internal citations and quotation marks omitted). The "objective observer" here is presumed to comprehend the "difference between what the government intends and what it produces," because he must understand the effect of what was actually conveyed. *Id.*

To determine whether the primary message had a disapproving effect on religion, we must view the restriction "as a whole." *Am. Family Ass'n*, 277 F.3d at 1122; *see also Catholic League*, 567 F.3d at 605. Because the message can be impacted by its context, it is important to not separate portions of the restriction and view them in isolation. *Catholic League*, 567 F.3d at 605 (citing *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring)). We will view the restriction in its totality and in light of the surrounding circumstances. *Id.*

In *Vasquez*, we considered whether removal of a cross from public land showed governmental hostility toward religion. We said no, finding that removal was "more reasonably viewed as an effort to restore [the government's] neutrality and to ensure their continued compliance with the Establishment Clause." *Vasquez*, 487 F.3d at 1257. The action was taken "only after the presence of crosses on other municipal seals had been held to be unconstitutional." *Id.*

**[10]** Similarly, here the District took actions reasonably perceived as an attempt to avoid conflict with the Establishment Clause. The year prior to Nurre's graduation, ceremony attendees had complained that the choir's performance of a musical piece referencing angels, God, and heaven illustrated the District's preference for one type of religion over another. Permitting a performance of "Ave Maria"—an obviously religious piece based on the title printed in the program—at graduation could have had the same impact. A reasonable person, informed as to the history of the District's prohibition on the Wind Ensemble's performance, would understand that the

action had the secular effect of maintaining neutrality and ensuring the District's continued compliance with the Establishment Clause.

**3**

**[11]** The final prong of the *Lemon* test seeks to bar governmental conduct that "foster[s] excessive government[al] entanglement with religion." 403 U.S. at 613. "[T]he Establishment Clause does not prohibit all entanglements; only excessive ones that demonstrate that a government program has the impermissible effect of advancing [or evidencing hostility toward] religion." *Prince v. Jacoby*, 303 F.3d 1074, 1096 (9th Cir. 2002), *cert. denied*, 540 U.S. 813 (2003). "Entanglement is a question of kind and degree," *Lynch*, 465 U.S. at 684, and this "prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs." *Cammack v. Waihee*, 932 F.2d 765, 780 (9th Cir. 1991).

As we have explained, there are two types of entanglement: administrative entanglement and political entanglement. *Vernon v. City of L.A.*, 27 F.3d 1385, 1399 (9th Cir. 1994); *see also Lemon*, 403 U.S. at 619-23. "Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion." *Vernon*, 27 F.3d at 1399. "[P]olitical entanglement [occurs when] political divisiveness result[s] from government action which divides citizens along political lines," and by itself is insufficient to constitute excessive entanglement. *Id.* at 1401; *Am. Family Ass'n*, 277 F.3d at 1123; *Cammack*, 932 F.2d at 781.

**[12]** While Nurre makes a credible claim that there was entanglement, she fails to make any concrete arguments regarding which type of entanglement existed. Therefore, we consider both. First, as we stated in *Brown v. Woodland Joint Unified School District*, 27 F.3d 1373, 1384 (9th Cir. 1994), "one-time review, which was conducted in response to [ ]

complaints . . . clearly does not cause the School District to become entangled with religion." *See also Catholic League*, 567 F.3d at 609 (Berzon, J., concurring) (noting that the resolutions at issue "were not repeated or pervasive, but discrete"). Here, the District requested that all music remain secular in direct response to multiple complaints that the JHS graduation had included religious music in the past. This inquiry occurred only once that year and was done merely by reviewing song titles for overtly religious references. Further, there is no evidence that the policy sent via e-mail from Brandsma to the District's high school principals applied to anything other than graduation or that it trumped the existing District policy for any other musical performances.

**[13]** Second, the policy at issue did not create political entanglement. Importantly, "the political entanglement inquiry seems to be applied mainly in cases involving direct financial subsidies paid to parochial schools or to teachers in parochial schools." *Vernon*, 27 F.3d at 1401 (citations omitted). It is obvious that this type of entanglement is not at issue here. Also, absent from the record is any evidence that this policy caused political divisiveness. We do not engage in hypothesizing about what political response might occur in such a case. As Justice O'Connor noted in *Lynch*, "[g]uessing the potential for political divisiveness inherent in a government practice is simply too speculative an enterprise." 465 U.S. at 689 (O'Connor, J., concurring).

**[14]** Because we find that the District satisfied all three prongs of the *Lemon* test, we hold that its conduct did not violate the Establishment Clause.

Finally, we also wish to make clear that we do not hold that the performance of music, even "Ave Maria," would necessarily violate the Establishment Clause. We hold only that Whitehead's actions were reasonable in light of her past experience and her understanding of the law and did not violate Nurre's constitutional rights.

# C

**[15]** Nurre's final claim is that the District violated her right to equal protection of the law under the Fourteenth Amendment. She argues that the District unreasonably treated her, and the other senior Wind Ensemble members, differently than past classes who were permitted to select the music performed. She attempts to invoke the "class of one" theory, set forth by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000) (per curiam). "When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim." *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (citing *Vill. of Willowbrook*, 528 U.S. at 564). Neither we, nor the Supreme Court, have ever applied a "class of one" theory in this context and we do not extend it to cover this case.

**[16]** To the extent Nurre claims—apart from her "class of one" argument—that the District violated the Equal Protection Clause, we apply rational basis review. This is because "a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose." *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526 U.S. 124, 127-28 (1999) (alteration in original) (internal quotation marks and citations omitted). A claim that one group of graduates was permitted to select a song for graduation while another was not certainly involves neither a fundamental right nor a suspect class.

**[17]** The District had a legitimate interest in avoiding what it believed could cause confrontation with the Establishment Clause. *Cf. Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761-62 (1995) (holding "that compliance with the Establishment Clause is a state interest sufficiently compelling to justify . . . restrictions on speech"). Its requirement

that all musical selections be secular was a reasonable action taken to avoid confrontation with the Establishment Clause. Because the District's action passes muster under rational-basis review, it did not violate Nurre's rights under the Equal Protection Clause.

## IV

We hold that Nurre's equitable claims are moot now that she has graduated from Jackson High School. While Nurre could maintain a post-graduation claim for monetary damages, we hold that the district court properly granted summary judgment to the defendants—Whitehead and the District—because Nurre failed to show any constitutional violation.

**AFFIRMED**.

---

MILAN D. SMITH, JR., Circuit Judge, dissenting in part, but concurring in the judgment:

I write separately because I disagree with the majority's conclusion that banning the playing of an instrumental version of the musical number *Ave Maria* at the Jackson High School graduation ceremony was a reasonable restraint on freedom of expression. I would hold that, in prohibiting Nurre and her classmates from playing their selected piece of music, the School District misjudged the Establishment Clause's requirements and, in so doing, violated Nurre's First Amendment rights.[1] I am concerned that, if the majority's reasoning on this issue becomes widely adopted, the practical effect will be for public school administrators to chill—or even kill—musical and artistic presentations by their students in school-

---

[1] I agree with the majority that there was no violation of either the First Amendment Establishment Clause or the Fourteenth Amendment Equal Protection Clause.

sponsored limited public fora where those presentations contain any trace of religious inspiration, for fear of criticism by a member of the public, however extreme that person's views may be.

The First Amendment neither requires nor condones such a result. The taking of such unnecessary measures by school administrators will only foster the increasingly sterile and hypersensitive way in which students may express themselves in such fora, and hasten the retrogression of our young into a nation of Philistines, who have little or no understanding of our civic and cultural heritage. Nonetheless, as much as I deplore what was done in this case, because the relevant guiding principles in this area are unsettled, I believe that Dr. Whitehead and the School District are entitled to qualified immunity, and I therefore concur in the judgment.

The School District concedes that the graduation ceremony in this case was a limited public forum. Assuming, as the majority does, that such is the case, the restrictions imposed in this instance pass muster only if the restrictions are: (1) viewpoint neutral and (2) reasonable in light of the purpose served by the forum. *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 907-08 (9th Cir. 2007) (" 'The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.' " (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992))), *overruled on other grounds by Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 375 (2008). I believe that the School District's restriction here fails that test. Though the prohibition was viewpoint neutral, it was not "reasonable in light of the purpose served by the forum," *id.* at 897.

To gauge the reasonableness of the School District's restriction, it is important first to appreciate the far-reaching influence of religion and religious institutions on music. It is undisputed that much of the music composed in the Western

World during the musical eras known as the medieval, baroque, and classical periods was fostered by one or more of the major European Christian denominations. *See Doe v. Duncanville Ind. Sch. Dist.*, 70 F.3d 402, 407 (5th Cir. 1995) (crediting testimony that "60-75 percent of serious choral music is based on sacred themes or text"); Richard Collin Mangrum, *Shall We Sing? Shall We Sing Religious Music in Public Schools?*, 38 CREIGHTON L. REV. 815, 866 (2005) ("[A]pproximately forty-four percent of the music recommended by the Music Educators National Conference for inclusion in the public school curriculum—for the secular purposes of preserving 'America's vast and varied music heritage,'—has religious significance."); ALL MUSIC GUIDE TO CLASSICAL MUSIC 1539 (Chris Woodstra, et al. eds., Backbeat Books 2005) (noting Pope Gregory's role in spurring medieval monophonic Gregorian chants); *id.* at 1541 (describing how "Protestantism's emphasis on the Scriptures" significantly influenced J.S. Bach's baroque compositions).

Though largely fostered in connection with the church, some of these religiously-prompted works are now performed primarily to express an artistic, secular message. As a result, current popular music comprises a significant number of works that, though originally inspired by religion, have since become largely secularized. Handel's *Hallelujah Chorus* from *The Messiah*, Steffen and Ward Howe's *The Battle Hymn of the Republic*, Beethoven's *Ode to Joy*, Mozart's *Requiem Mass in D minor*, and Purvis and Black's *When the Saints Go Marching In*, are but a few examples. When performed instrumentally and without lyrics, moreover, these and similar pieces take on an even more secular character.

Though it is a more contemporary composition, the Jackson High School students' selected piece is one such work. It is an arrangement for wind instruments originally written by twentieth-century German composer Franz Biebl. Biebl composed the original work in 1964 for performance, not in a church, but by a firemens' chorus. Here, the purpose of the

graduation ceremony—including the wind ensemble's performance of the piece—was to acknowledge the achievements of the Jackson High School students. That recognition included the opportunity to express themselves through speech and music.

The School District justified its decision to prohibit the performance by citing its goal of making the event "entirely secular in nature."[2] In my view, purging such a ceremony of all vestiges of religiously inspired art and culture—including those works with even the most attenuated connections to religion—did not advance the purpose of recognizing and providing a forum for student achievement. To the contrary, given religion's pervasive influence on classical music discussed above, the censorship did the opposite, curtailing the students' secular artistic expression. That prohibition was therefore unreasonable in light of the forum's purpose.

Taking a contrary view, the majority relies on our decision in *DiLoreto v. Downey Unified School District Board of Education*, 196 F.3d 958, 967 (9th Cir. 1999), as well as out-of-circuit cases, *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1122 (3d Cir. 1992), and *Student Coalition for Peace v. Lower Merion School District Board of School Directors*, 776 F.2d 431, 437 (3d Cir. 1985), to support its conclusion that the ban was reasonable in light of the forum's purpose. None of these cases, however, is on point. In *DiLoreto*, we held that it was reasonable for a school district to prohibit a large banner advertisement of the Ten Commandments—an obvious attempt at proselytization—on school property. *See* 196 F.3d at 962, 967. In *Brody*, the Third Circuit noted that restricting

---

[2]In marked contrast to what was done in this case, in previous years the School District had condoned the ensemble's playing a piece titled *On a Hymnsong of Phillip Bliss* at the school's graduation ceremony. A "hymn" is defined as, among other things, a "song of praise to God" and a "metrical composition adapted for singing in a religious service." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1111 (2002).

a student's overtly evangelizing graduation speech would be acceptable. 957 F.2d at 1122. And in *Student Coalition for Peace*, the court held that a school district could prohibit a large partisan political rally on school grounds that could potentially generate significant controversy and disruption. 776 F.2d at 437.

Unlike in *Student Coalition for Peace*, the wind ensemble's playing of *Ave Maria* here would not have risked creating a disruption or generating appreciable controversy. In that sense, the piece is distinguishable from *Up Above My Head*, the song performed at the Jackson High School 2005 graduation, which proclaimed, "I hear music in the air, oh Lord. . . . I really do believe there's a heaven somewhere" and which, according to Whitehead, contained references to Jesus Christ. In contrast, the playing of the *Ave Maria* arrangement could not have reasonably been interpreted to convey a religious message, nor was any such message intended. Rather, as Nurre stated, it was simply "a pretty piece." She further explained that, "it's the kind of piece that can make your graduation memorable because we actually learned to play it really well. And we wanted to play something that we enjoyed playing." For this reason, unlike as in *DiLoreto*, the performance would not have been viewed as proselytizing; as stated, the arrangement contains no words at all.

Though the majority does not reach this issue, the censorship also cannot be justified by relying on the so-called Establishment Clause defense. That defense is available only if the District's "refusal to allow the students to [perform *Ave Maria*] as part of the graduation was necessary to avoid violating the Establishment Clause." *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1101 (9th Cir. 2000) (citing *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Lee v. Weisman*, 505 U.S. 577 (1992))*; see also Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044 (9th Cir. 2003). A school district may be obligated to censor religious messages for two reasons: (1) "to avoid the appearance of government sponsor-

ship of religion"; and (2) to not "impermissibly coerc[e] . . . dissenters, requiring them to participate in a religious practice even by their silence." *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 983 (9th Cir. 2003) (citing *Cole*, 228 F.3d at 1101, 1104).

Neither reason is present here. Whitehead stated that she and the other administrators "made the decision" "because the title of the piece would be on the program and it's *Ave Maria* and that many people would see that as religious in nature." The majority relies on this justification and calls *Ave Maria* an "obviously religious piece," Maj. Op. at n.1, and a "well known Roman Catholic prayer," *id.* at 12744. However, as stated, the tune is not that of the better-known piece by Schubert, but a relatively obscure contemporary work, unlikely to trigger a religious association in most audiences. And even Whitehead, a school administrator with a doctoral degree and formal training in the place of religion in public schools, admitted that she did not know the meaning of the words "Ave Maria," but only had a vague sense that the term had some religious origin.[3]

Simply allowing the playing of a student-selected instrumental classical musical piece (with a title in a dead language whose meaning would be unrecognizable to most attendees of the graduation) cannot reasonably be construed as "government sponsorship of religion," *id.* For similar reasons, merely attending an event where one of the several musical numbers is an obscure classical piece does not constitute "participat[-ing] in a religious practice," *id.*, even if the title of that piece happens to be a Latin expression for a religious invocation. While governments have "a compelling interest in not committing *actual* Establishment Clause violations," there is no

---

[3]As amicus for Nurre notes, many common proper nouns for secular entities have religious origins. For example, the cities Los Angeles (originally "our lady of the city of the angels"), San Diego ("Saint Didacus"), and Las Cruces ("the crosses") each contain overt religious references.

legitimate interest "in discriminating against religion in whatever other context it pleases, so long as it claims some connection, however attenuated, to establishment concerns." *Locke v. Davey*, 540 U.S. 712, 730 n.2 (2004) (Scalia, J., dissenting) (internal citations omitted). As I see it, that is essentially what occurred here.

I readily acknowledge that no bright lines exist in this complex field of First Amendment law, and I sympathize with school officials, who often find themselves in a Catch-22, subject to criticism and potential law suits regardless of the position they take. Because of this unfortunate reality, I conclude that qualified immunity is appropriate in this case. But I also believe that, unless the courts provide balanced guidance on where those not-so-bright lines lie, we only perpetuate the confusion, encourage further litigation, and stunt student artistic expression in violation of the First Amendment.