# SUPREME COURT OF THE UNITED STATES

KATHRYN NURRE *v.* CAROL WHITEHEAD, INDIVIDU-
ALLY AND IN HER OFFICIAL CAPACITY AS THE SUPER-
INTENDENT OF EVERETT SCHOOL
DISTRICT NO. 2

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–671.　Decided March 22, 2010

The petition for a writ of certiorari is denied.

JUSTICE ALITO, dissenting from denial of certiorari.

The Ninth Circuit's decision in this case is not easy to square with our free speech jurisprudence. For this reason and because of the decision's important practical implications, I would grant the petition for a writ of certiorari.

## I

At the time of the events at issue, petitioner, Kathryn Nurre, was a high school senior and a member of her school's wind ensemble. In keeping with a school tradition, the school's band director told the seniors in the ensemble that they could select a piece from their musical repertoire to be performed during their graduation ceremony. The 2006 graduates, including petitioner, chose Franz Biebl's "Ave Maria,"[1] a piece that they had previ-

_____

[1] Many composers, including Schubert, Gounod, Verdi, Mozart, Elgar, Saint-Saëns, Rossini, Brahms, Stravinsky, Bruckner, and Rachmaninoff, composed music for the Ave Maria. See 22 The New Grove Dictionary of Music and Musicians 670, 718 (2d ed. 2001) (Schubert); 10 *id.,* at 215, 233 (Gounod); 26 *id.,* at 462 (Verdi); 17 *id.,* at 319 (Mozart); 8 *id.,* at 131 (Elgar); 22 *id.,* at 130 (Saint-Saëns); 21 *id.,* at 763 (Rossini); 4 *id.,* at 208 (Brahms); 24 *id.,* at 560 (Stravinsky); 4 *id.,* at 480 (Bruckner). See also R. Threlfall & G. Norris, A Catalogue of the Compositions of S. Rachmaninoff 119 (1982). Some of these compositions are well known, but Biebl's, which was brought to the United States in 1970 by the Cornell University Glee Club, see M. Slon, Songs

ously performed and that "they believed showcased their talent and the culmination of their instrumental work." 580 F. 3d 1087, 1091 (CA9 2009). At the prior year's graduation ceremony, the student choir had performed "'Up Above My Head,' a vocal piece which included express references to 'God,' 'heaven,' and 'angels,'" and the school district claimed that this had resulted in "complaints from graduation attendees" and at least one angry letter to the editor of a local newspaper. *Ibid.; id.,* at 1101 (M. Smith, J., dissenting in part and concurring in judgment) (quoting lyrics); see also Brief in Opposition 7, and n. 28. Fearful that the performance of Biebl's "Ave Maria" would cause a similar reaction, even though the performance would not include the lyrics of the piece, school district officials vetoed the ensemble members' choice "because the title and meaning of the piece had religious connotations—and would be easily identified as such by attendees merely by the title alone." 580 F. 3d, at 1091. The associate superintendent sent an e-mail to all the principals in the district instructing them that "musical selections for all graduations within the District should be purely secular in nature."[2] *Ibid.* As a result of the dis-

—————

from the Hill: A History of the Cornell University Glee Club 174 (1998), is relatively obscure.

[2]It is not clear that this e-mail accurately reflected either the district's past or then-current practice. According to the brief in opposition, the district approved the piece that the wind ensemble played at graduation prior to 2006, "'On a Hymnsong of Philip Bliss.'" See Brief in Opposition 8; see also 580 F. 3d, at 1091. This song, which not only includes the term "hymn" in its title, is an arrangement of Philip Bliss' hymn "It is Well with My Soul" that has fervently religious lyrics, including the following:

"Though Satan should buffet, though trials should come,
Let this blest assurance control,
That Christ hath regarded my helpless estate,
And hath shed His own blood for my soul."
Spafford and Bliss, It is Well with My Soul, in Gospel Hymns No. 2, p. 78 (P. Bliss & I. Sankey 1876); D. Holsinger, On a Hymnsong of Philip Bliss

trict's decision, the members of the wind ensemble "reluctantly elected to perform the fourth movement of Gustav Holst's 'Second Suite in F for Military Band.'" *Ibid.*

Petitioner then brought this action against the school superintendent in her official and individual capacities, claiming, among other things, that the district's decision had violated her right to freedom of speech. The District Court granted summary judgment for the superintendent, and a divided panel of the Ninth Circuit affirmed. 580 F. 3d 1087. The majority acknowledged that the performance of "an entirely instrumental" musical piece "is speech as contemplated by the First Amendment," and assumed, as the school district had conceded, that the school had created a "'limited public forum'" when it allowed the members of the wind ensemble to choose the piece that they wished to play. *Id.,* at 1093–1094. Nevertheless, the majority held that the vetoing of the ensemble members' selection had not violated their free speech rights because "it is reasonable for a school official to prohibit the performance of an obviously religious piece" "when there is a captive audience at a graduation ceremony, which spans a finite amount of time, and during which the demand for equal time is so great that comparable non-religious musical works might not be presented." *Id.,* at 1095. Dissenting on the free speech issue, Judge Smith expressed concern that the panel's decision would encourage public school administrators to ban "musical and artistic presentations by their students in school-sponsored limited public fora where those presentations contain any trace of religious inspiration, for fear of criticism by a member of the public, however extreme that person's views may be." *Id.,* at 1099.

––––––––––

(1989), http://trnmusic.com/pdfs/scorepdfs/onahymnsongofphilipbliss.pdf (as visited Mar. 19, 2010, and available in Clerk of Court's case file); see also R. Garofalo, On a Hymnsong of Philip Bliss: A Teaching/Learning Unit 9 (2000). Whatever distinction the district perceived between this piece and Biebl's "Ave Maria" is not revealed by the record.

## II

When a public school administration speaks for itself and takes public responsibility for its speech, it may say what it wishes without violating the First Amendment's guarantee of freedom of speech. *Pleasant Grove City* v. *Summum*, 555 U. S., ___, ___ (2009) (slip op., at 4–5). But when a public school purports to allow students to express themselves, it must respect the students' free speech rights. School administrators may not behave like puppet masters who create the illusion that students are engaging in personal expression when in fact the school administration is pulling the strings.

Our cases use the term "limited public forum" to describe a situation in which a public school purports to allow students to express their own views or sentiments. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829–830 (1995); *Widmar* v. *Vincent*, 454 U. S. 263, 272–273 (1981); see also *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–48 (1983). In such a forum, we have held, the State "must not discriminate against speech on the basis of viewpoint." *Good News Club* v. *Milford Central School*, 533 U. S. 98, 106 (2001); see also *Rosenberger, supra,* at 829. Our cases also make it perfectly clear that discrimination against religious, as opposed to secular, expression is viewpoint discrimination. *Good News Club, supra,* at 107; *Rosenberger, supra,* at 830, 831; *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 393–394 (1993). And our cases categorically reject the proposition that speech may be censored simply because some in the audience may find that speech distasteful. See *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 814–816 (2000); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992); *Board of Ed., Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U. S. 853, 871–872 (1982) (plurality opinion); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S.

503, 508–509 (1969).

In this case, however, the Court of Appeals held that a public school did not violate the free speech rights of a student when the school, after creating a limited public forum, banned the performance of "an obviously religious piece" because the piece might offend some members of the "captive audience at a graduation ceremony." 580 F. 3d, at 1095. The tension between this reasoning and the fundamental free speech principles noted above is unmistakable.

The Court of Appeals, in a footnote, acknowledged that the district's decision would have been impermissible if it had constituted viewpoint discrimination, but the court concluded that "this is not a case involving viewpoint discrimination" because petitioner "concede[d] that she was not attempting to express any specific religious viewpoint" but instead "sought only to 'play a pretty piece.'" *Id.,* at 1095, n. 6. This reasoning is questionable at best.

First, the Court of Appeals' holding, as set out in the body of its opinion, does not appear to depend in any way on petitioner's motivation in helping to select the Biebl piece. The Court phrased its holding as follows: "[T]he District's action in keeping all musical performances at graduation 'entirely secular' in nature was reasonable in light of the circumstances surrounding a high school graduation." *Id.,* at 1095. Nothing in the body of the court's opinion suggests that its decision would have come out the other way if petitioner had favored the Biebl piece for religious rather than artistic reasons. Second, the school district did not veto the Biebl piece on viewpoint-neutral grounds. On the contrary, the district banned that piece precisely because of its perceived religious message—that is, because the district feared that members of the audience would view the performance of the piece as the district's sponsorship of a religious message. See Pet. for Cert. 7 (quoting letter to the editor criticizing 2005

graduation program). Banning speech because of the view that the speech is likely to be perceived as expressing seems to me to constitute viewpoint discrimination.

The decision below will have important implications for the nearly 10 million public school students in the Ninth Circuit. Even if the decision is read narrowly, it will restrict what is purportedly personal student expression at public school graduation ceremonies. And as Judge Smith noted, the Ninth Circuit's reasoning may be applied to almost all public school artistic performances. 580 F. 3d, at 1099 (opinion dissenting in part and concurring in judgment). The audience at such events, which generally consists overwhelmingly of relatives and friends of the performers, may be regarded as no less "captive" than graduation attendees. If the decision is applied to such performances, school administrators in some communities may choose to avoid "controversy" by banishing all musical pieces with "religious connotations." *Id.,* at 1095, 1091 (majority opinion).

The logic of the Ninth Circuit's decision has even broader implications. Why, for example, should the Ninth Circuit's reasoning apply only to musical performances and not to other forms of student expression, including student speeches at graduation ceremonies and other comparable school events? Moreover, unless discrimination against speech expressing a religious viewpoint is less objectionable than other forms of viewpoint discrimination, the Ninth Circuit's decision may provide the basis for wide-ranging censorship of student speech that expresses controversial ideas. A reasonable reading of the Ninth Circuit's decision is that it authorizes school administrators to ban any controversial student expression at any school event attended by parents and others who feel obligated to be present because of the importance of the event for the participating students. A decision with such potentially broad and troubling implications merits our review.